UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| AMBER McCRACKEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-02290-JRS-MG |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Summary of the Facts**

Plaintiff is a young mother who began working as a correctional officer at the Indiana

Department of Correction ("DOC") Putnamville Correctional Facility ("PVCF") in November

2017. Dkt. 116-1 at 1, ¶4 (Affidavit of McCracken). She had good work performance, and a year

later, in December 2018, she received a raise based on the Defendant's performance evaluation

of her showing her good performance ratings. Dkt. 116-2 at 5 (McCracken Dep. 17:19-22); Dkt.

116-20. She was asked to, and did, train new employees as a field training officer. Dkt. 116-2 at

4 (McCracken Dep. 16:3-19).

Plaintiff was subjected to a series of increasingly stressful sexual harassment incidents.

She complained to the Putnamville Human Resources ("HR") Generalist, Kathy Goss, about

Correctional Officer David Harris sexually assaulting her by grabbing her around the neck from

behind, pulling her backside to his frontside, and breathing in her ear. Dkt. 116-1 at ¶¶9-12; Dkt.

116-2 at 7 (McCracken Dep. 25:21-27:10); Dkt. 116-6. Goss minimized the sexual assault and

told Plaintiff that Plaintiff could transfer from her job position, which Plaintiff did not want to do

because she was not the person in the wrong. Dkt. 116-2 at 9 (McCracken Dep. 33:24-35:3).

Goss claimed to have talked to Harris, but Goss did not give Harris a transfer, written

counseling, or discipline. Dkt. 116-7; Dkt. 116-29.

The Defendant gave Harris no discipline for assaulting Plaintiff. Dkt. 116-7. Plaintiff was retaliated against by Harris, making her job harder and making her afraid. Dkt. 116-2 at 12-14, 45 (McCracken Dep. 48:12-55:14, 178:20-180:14).

The Defendant does not dispute that Plaintiff was sexually harassed, and the motion for summary judgment describes some of the sexual harassment and retaliation. Dkt. 65 at 2-12. Plaintiff complained to other employees, such as her sergeant, and the demeanor of other officers toward her completely changed. Dkt. 116-2 at 48-49 (McCracken Dep. 189:5-193:2).

Plaintiff complained to her supervisor, Lieutenant Donald Pinkston, but he told other employees not to be in a room alone with her because she had already complained about sexual harassment. *Id.* at 11 (McCracken Dep. 44:14-25). An employee spread nasty rumors about Plaintiff's sexual activities and called her sexual names. *Id.* at 11, 15 (McCracken Dep. 41:4-42:14, 57:10-21); Dkt. 116-4 at 14 (Goss Dep. 54:3-56:8); Dkt. 116-8. That employee also told offenders where Plaintiff lived and other personal information, endangering the safety of her and her children. *Id.*

Officer Tanner Wright told Plaintiff that they could go to the chapel and have sex, but she rejected him. Dkt. 116-1 at ¶¶56-57. A few days later, he caressed her inner thigh. *Id.* at ¶¶58-59. On another occasion, he walked from behind her and grabbed her butt. *Id.* at ¶¶60-61. Plaintiff tried to avoid him, but other employees would not grant her relief to allow her to avoid him. Dkt. 116-2 at 48-49 (McCracken Dep. 192:19-193:4). The discrimination and retaliation affected her performance, she was afraid to go to work, and she had panic attacks. *Id.* at 42 (McCracken Dep. 166:7-167:10). She was afraid that if she was attacked or assaulted, other employees would not show up to help her. *Id.* It caused her to be late for work and to miss work. *Id.* On many instances, nobody would relieve her, and so, she bled through her pants in the dorm, which was

humiliating on top of all of the other actions. *Id.* at 47 (McCracken Dep. 186:3-14).

Plaintiff continued to complain to Lieutenant Pinkston. She complained to him about not being trained for two units, and he told her that he would not assign her or any female to those two units. *Id.* at 21 (McCracken Dep. 82:24-83:24). He told her that she could complain to HR that it was discrimination, but he would tell HR that she was upset because he would not let her give him a blow job in the parking lot. *Id.* Plaintiff did not want to be falsely accused, so she resigned and stated that it was because of the sexual harassment. *Id.*; Dkt. 116-12.

HR claimed that it did not know about the sexual harassment and asked Plaintiff for copies of Plaintiff's reports describing her complaints. Dkt. 116-13. Plaintiff contacted HR, revoked her resignation, and complained again about the discrimination and retaliation. *Id.* Plaintiff also filed an EEOC charge, again describing in detail the discrimination and retaliation. Dkt. 116-16. Plaintiff requested leave. Dkt. 116-2 at 24 (McCracken Dep. 95:3-96:20); Dkt. 116-13. The Defendant did not grant her leave, but the Defendant ordered her to return to work, and she did. Dkt. 116-17.

The Defendant still did not take corrective action against Lieutenant Pinkston. Pinkston told Plaintiff that she should not have complained. Dkt. 116-2 at 50-51 (McCracken Dep. 200:4-201:6). Pinkston told her that she did not have to complain about what he said and that she could have just come to him and told him that she was not okay with him talking like that to her. *Id.* Pinkston continued making statements to her and others against Plaintiff, including statements against her attitude in the firearms review board, which failed Plaintiff, and then passed Plaintiff after a board without Pinkston. *Id.* at 25-26 (McCracken Dep. 97:6-101:20). Pinkston grabbed Plaintiff's hair and made derogatory comments about her hair. *Id.* at 30 (McCracken Dep. 118:25-119:16). HR Generalist Goss only told Pinkston not to touch officers and did not discipline Pinkston. Dkt. 116-4 at 20-21 (Goss Dep. 80:3-83:4).

Plaintiff became isolated without anyone to talk to about the sexual harassment and hostile work environment. Dkt. 116-2 at 35 (McCracken Dep. 137:24-138:4). Lieutenant Pinkston stood and stared at Plaintiff making her uncomfortable, and he told her things that indicated that he was watching her on the video monitors. *Id.* at 39 (McCracken Dep. 155:10-156:2). The Defendant told Plaintiff not to talk to anyone about the sexual harassment other than her superiors and HR. *Id.* at 29 (McCracken Dep. 113:24-114:23). The Defendant prevented Plaintiff from talking to her husband and coworkers about the sexual harassment, and it caused her divorce. *Id.* Plaintiff saw a former boyfriend in a unit in which she worked, and she transferred out of the unit to avoid her former boyfriend. *Id.* at 35-38 (McCracken Dep. 137:2-150:1). The Defendant then transferred her former boyfriend into the unit to which she transferred, without any legitimate reason for transferring him to her unit. *Id.* After work hours, Plaintiff communicated by cell phone with her former boyfriend. *Id.* Plaintiff used another person's name for the telephone calls, but the Defendant knew that the calls were to Plaintiff. *Id.* The Defendant then interrogated Plaintiff about the calls, and she admitted that she had communicated with her former boyfriend. *Id.* The Defendant then falsely told Plaintiff that it knew that she had trafficked the drug suboxone into the facility and that if she admitted it, she would not be in trouble. *Id.* Plaintiff did not want to be in trouble, so she admitted it in order to be able to leave and go home to her children. *Id.* The Defendant then terminated Plaintiff for being in contact with her former boyfriend and for trafficking suboxone. *Id.*; Dkt. 116-28. The Defendant's actions and inactions caused Plaintiff's communication with her former boyfriend and the false allegation that she trafficked drugs, which caused her termination. Dkt. 116-2 at 40 (McCracken Dep. 157:8-20).

The decision of *Pennsylvania State Police v. Suders*, 542 U.S. 129, 136 (2004) illustrates harassment and retaliation by law enforcement supervisors to stop a female from complaining

4

about sexual harassment and causing not just a termination, but a constructive termination, which is even harder for a plaintiff to prove. The *Suders* decision described how "Suders' supervisors arrested her for theft, and Suders resigned from the force." *Id.* The *Suders* decision concluded that her supervisor's "reports of plaintiff's failures were false." *Id.* "Suders supervisors devised a plan to arrest her for theft." *Id.* The issues of fact precluded summary judgment. 542 U.S. at 152.

The Defendant has no effective system of complaints of sexual harassment and no effective system of the correction and prevention of sexual harassment. HR Generalist Goss testified that she keeps all complaints in two file drawers. Dkt. 116-4 at 26 (Goss Dep. 101:20-103:6). She guessed that she had seven or eight complaints of sexual harassment in the past five years, but even at the time of her deposition, she could not identify a complainant or harasser. *Id.* at 3-4 (Goss Dep. 11:16-14:24). She asked Plaintiff to send her copies of the complaints that Plaintiff had made, and Plaintiff did so. Dkt. 116-15.

A few months after the Defendant terminated Plaintiff, young female officer Sadie Lane complained to HR that Lieutenant Kenneth Lowe grabbed her butt. Dkt. 116-30. Lieutenant Pinkston, with Lowe present, told Lane that she should not have complained to HR. Dkt. 116-3 at 3 (Lane Dep. 10:7-11:20). Pinkston's statement to Lane was similar to his statement to Plaintiff that she should not have complained to HR. Dkt. 116-2 at 50-51 (McCracken Dep. 200:4-201:6). He had also threatened Plaintiff if she complained to HR, he would make the false allegation that he refused to allow her to give him a blow job in the parking lot. *Id.* at 21 (McCracken Dep. 82:24-83:24). Pinkston later surveilled Plaintiff, caused her former boyfriend to be transferred to the unit that she transferred to, caused Plaintiff to be falsely accused of trafficking drugs, and caused Plaintiff's termination. *Id.* at 39 (McCracken Dep. 155:10-156:2); Dkt. 116-1 at ¶¶144-153; Dkt. 116-28.

The Defendant demoted Lieutenant Lowe, but the Defendant failed to produce the

investigation of Lowe. Dkt. 116-37; Dkt. 116-38. The Defendant found that Pinkston attempted to get Sadie Lane to lie, he obstructed an investigation, and he was trying to hide information from human resources. Dkt. 116-4 at 9 (Goss Dep. 33:18-36:24); Dkt. 116-30; Dkt. 116-31. The Defendant did not terminate Pinkston and instead, only demoted him and transferred him to another facility. *Id.*; Dkt. 116-30; Dkt. 116-31; Dkt. 116-33; Dkt. 116-35 at 1-4. In spite of all of Plaintiff's evidence, and in spite of the complaints against Pinkston before and after Plaintiff's complaints, the Defendant has still refused to provide any relief to Plaintiff.

## Statement of Material Facts in Dispute and Additional Facts

Plaintiff agrees with the Defendant that from November 2017 to July 23, 2019, she worked as a correctional officer for the DOC. Dkt. 65 at 2:2-4, citing McCracken Dep. at 15:22-24; 16:20-23. Plaintiff agrees with the Defendant that Plaintiff alleges several instances of discrimination, harassment, or retaliation. Dkt. 116-2 at 5 (McCracken Dep. 20:9-13). However, the Defendant's Statement of Material Facts ignores many of the facts that after Plaintiff complained to Defendant about the discrimination, harassment, and retaliation, it escalated so badly that she was unable to work, she had to resign to get away, and she revoked her resignation and tried to work again, but after being assaulted by the neck, by the butt, and by the hair, false statements were made about her, she was threatened with more false statements, she was afraid for the safety of herself and her children, she was humiliated, it affected her performance, it was a struggle every day to go to work and caused her to be late and to not go to work, she had panic attacks, it caused her divorce, and it caused her termination. *Id.* at 29, 38-43 (McCracken Dep. 113:24-114:23, 149:3-169:15). Plaintiff will respond to the incidents that the Defendant's Statement of Material facts did list.

*Robertson incident—December 2017*

Plaintiff does not dispute the Defendant's statement on this incident. Dkt. 65 at 2. Officer

Robertson told Plaintiff "to put my ass against the wall because he couldn't concentrate on what was going on around him," she complained to Field Training Officer Dunn, he apologized and spoke to Officer Robertson, and officer Robertson apologized, which was appropriate.

*Harris incident—February 2018*

Plaintiff does not dispute the Defendant's statement of the Harris incident as far as the facts that are stated. Dkt. 65 at 3-4. Officer Harris placed his hand on Plaintiff's inner thigh and brought it to her knee. When she walked away, Officer Harris came up behind her, wrapped his right arm around her neck, pulled the back of her body against the front of his body, placed his head near her shoulder, and stood there beathing heavily into her ear. Plaintiff complained to Sergeant Gilley and the next day, she complained to Sergeant Nauman, who took her to Lieutenant Pinkston. Pinkston did not tell her to complain to HR, but rather, told her that "he has ways around to get it directly to human resources, so that way other people don't have to sign off on it so it doesn't get around that I'm the kind of person to make reports like this all the time." Dkt. 116-2 at 8 (McCracken Dep. 31:8-13). She submitted an incident report to Pinkston by email. *Id.* at 8 (McCracken Dep. 31:16-32:22). Pinkston should have allowed her to complain to HR without Pinkston filtering her information, and without Pinkston making her afraid to make other reports of sexual harassment. Pinkston later told Sadie Lane not to complain to HR after Lieutenant Lowe grabbed her butt and Lane had already complained to HR. Dkt. 116-3 at 3 (Lane Dep. 10:7-11:12). Pinkston had a history of discouraging complaints of sexual harassment and lying about them.

The Defendant admits that HR Generalist Goss wrote a summary finding that the allegations were unfounded, and she did write that, but it is disputed that the allegations were unfounded, and the Defendant should have disciplined Officer Harris for the sexual assault on Plaintiff. Dkt. 116-2 at 9 (McCracken Dep. 33:25-37:3). The Defendant also admits that it

required Officer Harris to attend harassment prevention training, which further confirms Plaintiff's allegations, but the Defendant failed to terminate Harris and failed to stop the sexual harassment and retaliation against Plaintiff.

The Defendant admits that Goss talked to Plaintiff "months later," which is evidence of the failure of the Defendant to take action, which was the result of delay by Lieutenant Pinkston and Goss adding to the minimalization by the Defendant of Plaintiff's complaint. Dkt. 65 at 4:9-10.

The Defendant also admits that Goss suggested that Plaintiff could switch to a different bracket or that *Plaintiff* could do her best to remain professional when dealing with Officer Harris. *Id.* at 13-15. Telling the victim that she could move, instead of the harasser, or she could do her best to remain professional, is not appropriate corrective action, especially for the sexual assault of the victim.

The Defendant further confirms Plaintiff's allegations by stating that Goss reported that she had spoken to Officer Harris and told him that "he should leave personal life at home, and told Officer Harris that Ms. McCracken was not interested in any kind of romantic or sexual relationship." *Id.* at 16-18.

To make matters worse, when Plaintiff filled out a report with the assistance of Sergeant Gilley, "Lt. Pinkston said that from now on, if she needed to fill out an incident report, she needed to do it at the shift office, because she's not allowed to be left alone with another officer, as they already had one sexual harassment incident report being filed by her." *Id.* at 5:2-7.

After Plaintiff complained about Lieutenant Pinkston saying that, Goss did not do any investigation, but Goss asked Pinkston why he was saying that. According to Goss, Pinkston said he wasn't saying that, but Goss only advised him not to say anything like that. *Id.* at 5:8-12. Other employees also later complained that Pinkston was making such statements about Plaintiff,

but the Defendant did not do anything about it. Dkt. 116-9.

Harris admitted that he made sexual advances to Plaintiff and that he touched her knee and shoulder. Dkt. 116-7. Harris did not deny that in touching her knee, he put his hand on her inner thigh and brought it to her knee. *Id.* Harris did not deny that in the process of touching her shoulder, he grabbed her around the neck, pulled her backside into his frontside, and breathed in her ear. *Id.*

After Plaintiff had rejected the sexual advances of Harris and rejected his sexual assault, Harris refused to let Plaintiff pass the gate until Harris let a male in the gate and Plaintiff followed him. Dkt. 65 at 5-6. After Plaintiff rejected his advances and sexual assault, Harris slammed the door after Plaintiff, stomped around Plaintiff's area, would not perform his duties of picking up trays of offenders in Plaintiff's area, and expressed to Plaintiff in the parking lot that he did not like Plaintiff not accepting his advances. Dkt. 116-2 at 45-46 (McCracken Dep. 178:9-182:11). The actions of Harris interfered with Plaintiff's work and made Plaintiff fearful of seeing or working with Harris. *Id.*

*Incident regarding personal information*

Shortly after Plaintiff rejected Officer Harris, Plaintiff was told by offenders that they had been told by another officer Plaintiff's full name, where she was from, what high school she graduated from, that she was a despicable sexual name that is not fit to print in a public pleading, and that she had children. Dkt. 65 at 4-5; Dkt. 116-1 at ¶¶42-43; Dkt. 116-2 at 11 (McCracken Dep. 41:4-21); Dkt. 116-8. These statements were not only crushing to Plaintiff's reputation and her ability to work with officers and offenders; the statements also disclosed personal information about Plaintiff that put the safety of Plaintiff and her children in jeopardy. *Id.*

It is disputed that these events occurred on the same day that Plaintiff complained to Lieutenant Pinkston and Sergeant Nauman about Officer Harris. Dkt. 116-6; Dkt. 116-8.

The Defendant's Memorandum ignores the terrible sexual name that the Defendant spread about Plaintiff, even though that sexual name is stated in Plaintiff's incident report that she wrote to the Defendant. Dkt. 116-8. Additionally, the Defendant argues later, based on such omission, that there was nothing sexual about the "dissemination of personal information to offenders." Dkt. 65 at 16:2-4. The Defendant completely ignores some of the worse things said about Plaintiff, which ignores the legal standard for a motion for summary judgment. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014).

*Incident involving checkpoint gate*

After HR Generalist Goss gave Officer Harris a "stern talking to" about his sexual assault of Plaintiff, Harris would not let Plaintiff through the gate when she pushed the buzzer and was just inches away from him. Dkt. 65 at 5-6. The only reason that Plaintiff got through the gate was because another officer came, and she followed the other officer in. Dkt. 116-2 at 12-13 (McCracken Dep. 48:14-49:10). Harris acted angry at Plaintiff with his facial expression and slammed the gate shut, intimidating Plaintiff. *Id.*

*Incident involving Officer Wright—June or July 2018*

Officer Wright told Plaintiff that they could sneak off to the chapel if she worked overtime and have sex. Dkt. 65 at 6. Plaintiff rejected his advance and left the area. The Defendant's Memorandum claims that Plaintiff did not report this incident in any way to anyone, but that is not true. Plaintiff was afraid to complain further about sexual harassment because of the actions and statements of Officer Harris, Lieutenant Pinkston, and HR Generalist Goss, but later she complained about all of Wright's actions and her being afraid of working with him. Dkt. 116-2 at 23 (McCracken Dep. 92:1-6).

*Incident involving Officer Wright—August 2018*

The Defendant's Memorandum admits that while Plaintiff was handing medication to the

pharmacy, Officer Wright "caressed [her] behind with his hand, grabbed ahold of it." Dkt. 65 at 6:19. She was deterred from reporting the sexual assault, because she had reported the earlier sexual assault by Officer Harris and he had retaliated against her, but the Defendant said it was unsubstantiated. Dkt.116-6; Dkt. 116-7. She had also earlier reported being called a despicable sexual name and having her personal information given to offenders, endangering her safety, after complaining about the sexual assault by Harris, and the Defendant did not do anything. Dkt. 116-4 at 14 (Goss Dep. 54:3-56:8); Dkt. 116-8. She was afraid to immediately report the sexual requests and sexual assaults by Wright for fear of more retaliation, but she later reported all of Wright's actions to the Defendant, and the Defendant still failed to do anything. Dkt. 116-2 at 23 (McCracken Dep. 92:1-6).

*Incident involving Officer Coons—October or November 2018*

The Defendant's Memorandum admits that Officer Coons made the remark to Plaintiff that the offenders were "sure going to be happy to see you when they wake up, because all day yesterday all I heard about was your ass." Dkt. 65 at 7:5-6. Officers and offenders talking all day about a female officer's ass is not appropriate for any correctional facility. Plaintiff and another officer completed incident reports. Dkt. 116-10; Dkt. 116-11. Lieutenant Pinkston and Captain Wheeler merely talked to Coons and again minimized what happened, just as the Defendant continues to minimize all of the sexual harassment and retaliation. Dkt. 116-2 at 18-19 (McCracken Dep. 72:18-73:19). The Defendant's Memorandum argues that nothing was done as a result of Plaintiff's complaint because Coons had resigned. The inference is disputed that the Defendant could not have done anything, because the Defendant could have investigated the matter before Coons resigned. The Defendant could have investigated the matter after Coons resigned and could have made a report about the matter, could have apologized to Plaintiff, could have made an entry in Coons' personnel file, could have kept records of all of the incidents of

11

the escalating harassment and retaliation of Plaintiff, could have provided counseling and leave to Plaintiff, could have made Plaintiff feel comfortable to complain about sexual harassment, could have trained employees to prevent sexual harassment, and could have trained employees about how to request FMLA leave.

The Defendant did nothing to make complaining about sexual harassment acceptable or to prevent sexual harassment and retaliation. Instead, Lieutenant Pinkston and other employees continued to allow sexual harassment and retaliation. A female officer cannot have the same authority and respect of officers and offenders when they are allowed to talk about her ass all day. That point must be made by the Defendant to the officers and not allowed by the offenders. Had the Defendant investigated and taken action against the harassers, Plaintiff may not have been harassed and retaliated against later. Had the Defendant investigated and taken action against the harassers, Sadie Lane may not have had her ass grabbed later by Lieutenant Lowe and may not have been told by Pinkston not to report the sexual harassment to HR.

*Request for training*

The Defendant argues that McCracken did not receive training because she had missed roll call a few times, but the Defendant ignores the fact that she was late a few times because she feared for her safety going to work and suffered panic attacks because of it. Dkt. 116-2 at 42 (McCracken Dep. 166:7-167:10). The Defendant failed to correct the discrimination and retaliation, failed to make her feel safe, failed to allow her leave for the times she was late, claimed it could not do anything, and then denied her training because of the Defendant's failure to take corrective action. *Id.* at 21 (McCracken Dep. 82:24-83:24)

The Defendant cites McCracken's testimony that Captain Wheeler's action was appropriate, but the Defendant ignores the fact that Lieutenant Pinkston's actions were not appropriate. Dkt. 116-2 at 21-22 (McCracken Dep. 81:1-85:19). She testified that Wheeler

mistakenly believed that she was not eligible for training. *Id.* She testified that she had no discipline other than for missing roll call. *Id.*

The Defendant tries to dispute Pinkston's statement that McCracken could go tell HR that he was discriminating against her, and he would just tell them that she was upset because he would not let her give him a blow job in the parking lot. Dkt. 65-8. However, disputed facts cannot support summary judgment. *Malin, supra.* Furthermore, the Defendant cites no testimony disputing McCracken's testimony. Dkt. 65 at 8.

The Defendant tries to further argue that Pinkston's statement is "not a credible statement for him to make, because correctional officers and lieutenants are in separate parking lots." Dkt. 65 at 8:10-11. However, credibility cannot be an issue on a motion for summary judgment. Issues of credibility are for the jury to decide, not the court. *Malin, supra.*

Furthermore, the Defendant admits that at the time, there were no women working in the segregation unit. Dkt. 65 at 8. The Defendant argues that McCracken believes that this is because offenders in that unit are strip searched, and female officers do not conduct that kind of search, but that was not a legitimate reason to prevent females from working that unit, and McCracken was upset that she was being discriminated against. Dkt. 116-2 at 22 (McCracken Dep. 87:3-88:10). McCracken said that it was a nonissue, because there are more male officers than female officers, and there is always going to be a male officer present to do that. *Id.*

It is also disputed that McCracken did not report Lieutenant Pinkston's comments to anyone. After Plaintiff resigned because she did not want to be falsely accused by her lieutenant of asking for a blow job, she complained to HR, she complained to the EEOC who complained to the Defendant, and she complained to the warden. Dkt. 116-2 at 32-34 (McCracken Dep. 125:11-133:14); Dkt. 116-12; Dkt. 116-16. The warden told McCracken that he refused to investigate because men would not do what she complained about. Dkt. 116-2 at 33 (McCracken

Dep. 131:11-17).

The Defendant later admits that McCracken complained about Lieutenant Pinkston and others, but the Defendant gives no legitimate reason for not taking action against Pinkston and for McCracken. Dkt. 65 at 8-9. The Defendant allowed Pinkston to continue his discrimination and retaliation, as evidenced by the actions described below.

*Firearms review board and QRT training*

The Defendant admits that Lieutenant Pinkston interrupted McCracken's firearms review board with negative statements about her attitude, which affected her performance in the board and caused her not to pass the board. Dkt. 65 at 9. The Defendant gives no excuse for allowing Pinkston to negatively affect her performance after all of his discrimination and retaliation.

The Defendant does not dispute that McCracken's sergeant told her that Pinkston caused her to be pulled from the training list and she was not to go to training. *Id.* She complained about Pinkston, and she was allowed in training, confirming the negative statement that Pinkston was making about McCracken affecting her performance. Dkt. 116-2 at 25-26 (McCracken Dep. 100:21-101:10).

The Defendant admits that on the same day she was told not to go to training, Pinkston came to McCracken and stared at her for 30 to 45 minutes. Dkt. 65 at 10. She explained that it was uncommon for him to walk through the dorms, but he stared at her at her job without speaking for a long time and made her feel very uncomfortable. Dkt. 116-3 at 26 (McCracken Dep. 104:9-24).

McCracken attended the training without problems, showing that Pinkston's statements about her not taking it seriously and Pinkston staring at her for a long time without speaking was further harassment and retaliation of her. Dkt. 65-10.

14

*Calls about personal matters*

McCracken complained about friends of her husband making multiple calls to her about her marriage, and she complained that they should not be calling her for anything other than work. Dkt. 116-26. The Defendant admits that McCracken filed an incident report. Dkt. 65 at 10. The Defendant argues that they were not sexually harassing her, but it is evidence that she was being harassed after she complained about sexual harassment and retaliation, and she was told that she could not talk to anyone about it including her husband, which resulted in her divorce. Dkt. 116-2 at 29 (McCracken Dep. 113:24-114:23).

*Hair incident—June or July 2019*

McCracken complained about Lieutenant Pinkston grabbing ahold of her hair and tugging on it, and Pinkston did not deny it. Dkt. 65 at 11. HR Generalist Goss claimed that Pinkston told her that he said, "these cornrows or whatever the style are not within policy," but McCracken testified that her hair was allowed. Dkt. 116-1 at ¶120. The Defendant does not dispute that Pinkston was not allowed to grab and tug on McCracken's hair, but the Defendant only "counseled" Pinkston not to touch anyone's hair and did not give him any discipline or termination for grabbing and tugging on McCracken's hair after all of the discrimination and harassment he had done to McCracken.

*Meeting with Warden*

The Defendant admits that the warden asked McCracken for copies of her incident reports because HR Generalist Goss said she did not have any. Dkt. 65-12. McCracken had filed many incident reports and an EEOC charge, but HR and the warden did not have copies, which is evidence of the Defendant's failure to effectively keep records of complaints of sexual harassment and retaliation and failure to effectively prevent and enforce the harassment and retaliation laws. The Defendant then told McCracken that the men's word was better than hers,

15

even though the men had been reported for many acts of sexual harassment and retaliation, some of which were not disputed, including three assaults on the neck and body, the butt, and the hair, and Plaintiff had no discipline other than failure to meet some roll calls because of her fear and panic attacks. Dkt. 65 at 2-11; Dkt. 116-2 at 21-22 (McCracken Dep. 81:1-85:19).

*Relief to use the restroom*

The Defendant admits that on several occasions, McCracken was denied relief so that she could use the restroom. Dkt. 65 at 12. The Defendant ignores the fact that the denial was so bad that on many instances, McCracken bled through her pants and was humiliated on top of everything else. Dkt. 116-2 at 47 (McCracken Dep. 186:3-14). She was also afraid that employees would not show up if she was attacked or assaulted. *Id.* at 42 (McCracken Dep. 166:7-167:10). She had to go hands on with somebody who was relatively bigger than she could ever have managed on her own, and even after calling the signal, people did not show up until way later, when typically the response time would have been faster. *Id.* The Defendant did not provide any relief to McCracken and just advised all females to go up the chain of command. Dkt. 65 at 12. Plaintiff had made many complaints, and the Defendant did not provide relief for her.

*Termination of Ms. McCracken's employment*

The Defendant does not deny that allowing Plaintiff to be sexually harassed, retaliated against, and humiliated; causing her divorce; placing her former boyfriend in the unit that she transferred to; and her having no one else to talk to caused her to talk to her former boyfriend. Dkt. 65 at 12-13. She had previously reported that she knew Eric Boaz, and the Defendant transferred him to her unit when there was no reason to transfer him to that unit, other than the fact that she had complained against the Defendant. Dkt. 116-1 at ¶¶63, 122-123, 128.

The Defendant does not deny that its allegation against her of trafficking suboxone was a

16

false allegation and that she admitted to the false allegation so that she could leave to pick up her children after many acts of harassment and retaliation against her, and the Defendant did not correct any of them for her. She had been forced into a constructive discharge after Lieutenant Pinkston told her that he would make a terrible false allegation against her if she complained to HR again. She complained to HR after her resignation, but the warden told her that they would believe the men instead of her, so it was futile for her to complain further to the Defendant. Dkt. 116-2 at 16, 38-39 (McCracken Dep. 61:20-62:4, 150:16-154:6).

The use of false allegations against officers who complain about their bosses is not unusual. See, e.g., *Pennsylvania State Police v. Suders*, *supra*. *The New York Times* reported in March 2021 that in Suffolk County, New York, "Police officers testified that they feared for their families' safety or that they'd be framed for crimes if they blew the whistle on their boss. It's hard to imagine a starker illustration of the need to reinvest policing." Farah Stockman, "The County Where Cops Call the Shots," *The New York Times,* March 28, 2021, p. SR 4, nytimes.com/2021/03/26/opinion/police-suffolk-county-unions.html.

### Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(a)(1)(B). Affidavits or declarations to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show

17

that the affiant is competent to testify to matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in support of or in opposition to a party's factual assertions can result in the party's fact being considered disputed or undisputed and the potentially the denial or grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dougherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011)(vacating summary judgment), quoting *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979, citing *Celotex, supra*. The moving party cannot sustain its burden merely by denying the allegations in the

18

opponent's pleadings. Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2727, notes 42-44 (1998).

A motion for summary judgment should not be filed that does not follow the legal standards for granting a motion for summary judgment. *Malin v. Hospira, Inc.*, *supra*. A strategy that hopes that the court would disregard the legal standards for a motion for summary judgment is costly and wasteful. *Id.* The same is true for a reply brief in support of a motion for summary judgment that disregards the legal standards for the motion. *Littler v. Martinez,* 2019 WL 1043256, *3, *20 (S.D.Ind. 2019)(quoting *Malin, supra*. A reply that quotes a sentence of plaintiff out of context cannot support a summary judgment. *Littler v. Indiana Dept. of Corrections Com'r.*, 2013 WL 1149607, *3 (N.D.Ind. 2013).

The background section of the brief of the party moving for summary judgment "is supposed to contain the facts in the light most favorable to non-movant." *Miller v. Eli Lilly & Co.*, 2012 WL 3095572, *1 n. 1 (S.D.Ind. 2012). Unless the defendant "can win as a matter of law on the plaintiff's version of the material facts, as supported by the evidence, the Court cannot and will not award summary judgment."

## Argument

1.      **Ms. McCracken was subjected to discrimination based on her sex and a hostile workplace.**

      A.      **There is evidence that Ms. McCracken was subjected to a hostile work environment.**

The Defendant argues that "several of the incidents alleged cannot be considered sexual harassment under the first prong." Dkt. 65 at 16:1-15. But the Defendant does not dispute that many of the incidents are sexual harassment under the first prong, including sexual statements, sexual assaults, and sexual propositions, followed by worse treatment because of sex or rejection of requests for sex. *Id.*

The Defendant does not argue that the "several" incidents were not unwelcome, which is the substance of the first prong. *Id.*

The Defendant does not argue that the "several" incidents were not "based on sex" under the second prong. *Id.*

The Defendant argues that the "several" incidents have "no evidentiary basis to suggest a connection to sexual harassment." *Id.* at 16:13-14. The Defendant does not explain what it means by "connection."

Sexual harassment is not required to be of a sexual nature. Harassment based on sex includes both sexual harassment and harassment based on sex that is not sexual in nature. Harassment based on sex in any manner is called sex harassment. It is harassment of a person because of the person's sex. Sex harassment can, but need not be, motivated by sexual desire. An anti-female animus can support a hostile environment claim. A hostile work environment based on sex can include sexist remarks or treatment. A plaintiff can proceed on a claim when the work environment is hostile because it is sexist rather than sexual, or both sexist and sexual. *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80 (1998); *Passananti v. Cook County*, 689 F.3d 655, 664-665 (7th Cir. 2012); *Boumehdi v. Plastag Holdings, L.L.C.*, 489 F.3d 781, 788-789 (7th Cir. 2007).

Also, the acts of harassment because of complaints sexual harassment and discrimination do not need to be sexual in nature.

The "several" incidents listed by the Defendant in one paragraph as not being considered sexual harassment were of a sexual nature, were because of Plaintiff's sex, or were because of her complaints of sexual harassment. The Defendant includes in its list of incidents that after Plaintiff complained about sexual assaults and sexual statements, an officer gave personal information about her to offenders, which included "the kind of person she made me out to be in

20

school," that she had children, where she went to school, and the town she lived in. Dkt. 65 at 4-5; Dkt. 116-2 at 11 (McCracken Dep. at 41:4-21); Dkt. 116-8. These statements were not only sexual in nature and because of her sex, they were also of a serious nature endangering her safety and the safety of her children. *Id.* Plaintiff does not like to repeat the terrible sexual name that she was called and the statements that were made about her. Dkt. 116-1 at ¶¶42-43. But Plaintiff complained to HR Generalist Goss that an officer told offenders statements like that McCracken was a sexual name in high school and that McCracken was having sex with the higher ups so she could move up the ladder. Dkt. 116-4 at 14 (Goss Dep. 54:3-56:8). The Defendant now argues that those terrible statements about McCracken "cannot be considered sexual harassment under the first prong," which shows how wrong the Defendant's arguments are because they are terrible sexual statements followed by statements about Plaintiff's identity, endangering her safety and the safety of her children. Dkt. 65 at 16:2-4; Dkt. 116-2 at 10-11 (McCracken Dep. 40:15-42:14).

After Plaintiff turned down Officer Harris's advances for sex and he assaulted her, he refused to open a gate for her while allowing another employee to enter. Dkt. 116-2 at 12-14 (McCracken Dep. 48:14-55:14). Harris opened the gate for a male, and the female Plaintiff went in the gate after the male. *Id.* Harris slammed the gate, intimidating Plaintiff and continuing the hostile environment. *Id.*

After Plaintiff complained about the hostile work environment, it continued with her being denied leave and training. *Id.* at 19-23 (McCracken Dep. 75:1-90:16). She was denied training because she had missed roll call when she was too stressed to go to work a few days because of the sexual harassment and retaliation. *Id.* at 20-21 (McCracken Dep. 79:16-83:24); Dkt. 116-1 at ¶¶83-88. Lieutenant Pinkston also told Plaintiff that he would never train her or any other female in the segregated housing units, which of course was based on sex. Dkt. 116-2

at 21-22 (McCracken Dep. 82:24-87:24). Pinkston also told her that she could tell HR that he was discriminating, but he would tell HR that Plaintiff was upset because he would not let her give him a blow job in the parking lot, which was doubly based on sex. *Id.* No female was assigned to the segregation units, even though it was not against policy. *Id.*

The Defendant includes in its list of incidents: "Lt. Pinkston's comments at the firearms review board." His comments criticized Plaintiff's seriousness when she was so serious as to complain about not getting training. Dkt. 116-2 at 21-22 (McCracken Dep. 81:1-85:19). The board with Pinkston stated that she was not mentally equipped to handle the responsibility of a firearm, which was sexist. *Id.* at 25-26 (McCracken Dep. 97:6-101:20). She was granted a second hearing without Pinkston and passed. *Id.*

The Defendant includes in its list of incidents "the report that Ms. McCracken had been pulled from the training list by Lieutenant Pinkston." The report was made to Plaintiff by Sergeant Thompson, who was in charge of the course, and he told Plaintiff that she would not be required to be at the training because she was pulled from the list per Pinkston. *Id.* at 26 (McCracken Dep. 102:2-104:2). This incident of Pinkston pulling McCracken from the training list occurred after Pinkston's comments in the review board. *Id.*

The Defendant includes in its list of incidents: "Lieutenant Pinkston staring at Ms. McCracken while she filled out paperwork or handled issues with offenders." This incident occurred on the same shift after Plaintiff complained to Captain Wheeler about Pinkston taking Plaintiff off the training list. *Id.* at 26-27 (McCracken Dep. 104:3-105:9). Pinkston came to Plaintiff's dorm, stood by the dorm entry, and stared at her for 30 to 45 minutes without speaking to her the entire time that she was at the desk, making her feel more intimidated. *Id.* It was unusual for the lieutenant to walk the dorms, and the Defendant does not claim that he did that silent staring intimidation to male employees. *Id.*

22

The Defendant includes in its list of incidents the "calls from other officers about personal matters," and Plaintiff explained that "the dissolution of my marriage was directly a result of the harassment and retaliation and issues that I had been dealing with while working there, because of the emotional distress." *Id.* at 29 (McCracken Dep. 113:18-115:3).

The Defendant includes in its list of incidents "meeting with the Warden about her complaints." The Defendant even implies that the warden's failure to investigate, failure to review records, and failure to take any action cannot be considered sexual harassment, but his inactions enabled the sexual harassment and encouraged the retaliation. *Id.* at 32-34 (McCracken Dep. 125:9-133:18). The warden's statements about believing the men and not believing the female who had been repeatedly sexually harassed were sexist. *Id.* Plaintiff was floored by the warden's statements and so was the other female present, Ms. Fielden, a training coordinator. *Id.*

The Defendant includes in its list of incidents "the denial of relief to use the restroom." Plaintiff described how she was denied on multiple occasions to be able to use the restroom, and it caused bleeding through her pants and an anxiety attack. *Id.* at 46-52 (McCracken Dep. 184:10-208:12). By this time it was not only a continuation of the sexual harassment and discrimination against Plaintiff as a female, but also retaliation because she complained against officers. *Id.*

Each of the "several" incidents listed in passing by the Defendant were part of the sexual harassment, even though the Defendant argues that they "cannot be considered sexual harassment under the first prong." Dkt. 65 at 16:1-15. Furthermore, all acts of sexual harassment need not be of a sexual nature to be part of sexual harassment. *Oncale v. Sundowner Offshore Services, supra*; *Boumehdi v. Plastag Holdings, supra*; *Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999).

The Defendant's Memorandum ignores the facts favorable to Plaintiff and for the facts it

23

does recognize, it does not view them in the light most favorable to the Plaintiff, violating the legal standards for motions for summary judgment. *Tolan v. Cotton*, 572 U.S. 650 (2014); *Milan v. Hospira, Inc*, *supra*; *Littler v. Martinez*, *supra*; *Littler v. Indiana Dept. of Corrections Com'r., supra*; *Miller v. Eli Lilly*, *supra*. The Defendant's Memorandum "cherry picks" facts, which is condemned and wastes the time of the parties and the courts. Milan.

The Defendant's Memorandum then argues that "several more" incidents were not by supervisors, and that the employer can be liable only where the employer has "been negligent either in discovering or remedying the harassment," but the employer was negligent in failing to take any action on several occasions, including after Plaintiff's complaints to HR, to Pinkston, to other supervisors, to the EEOC, and to the warden. Dkt. 65 at 16-17.

The Defendant argues that Plaintiff testified that she does not believe that DOC should have done something additional to Officer Robertson other than causing his apology to Plaintiff for telling her to put her ass against the wall. *Id.* at 16. However, when Officer Harris made sexual advances to her and sexually assaulted her by grabbing her from behind around the neck and pulling her backside to his frontside, the Defendant did not even ask that he apologize. Dkt. 116-7. Instead, the Defendant said that her complaint was unfounded and required him to attend harassment prevention training, which was contradictory. *Id.* Plaintiff testified that he should have been disciplined. Dkt. 116-2 at 9, 15 (McCracken Dep. 36:13-19, 57:5-16). But the Defendant did not give him any warning, discipline or termination, allowing him and others to continue to harass Plaintiff. *Id.*; Dkt. 116-29. Harris continued to work for the Defendant until he was arrested for endangering children by passing a school bus, and the Defendant allowed him to resign after granting him extended leave. Dkt. 116-4 at 27-30 (Goss Dep. 108:17-114:11, 115:18-119:8); Dkt. 116-29.

The Defendant argues that Plaintiff did not complain about Officer Wright's statements,

but that was at the time of the incident, and she explained that it was because nothing was really done to Officer Harris. Dkt. 116-2 at 17-18 (McCracken Dep. 67:17-69:25). She also explained that she complained about Wright later, but nothing was done. *Id.* Shortly after Plaintiff resigned and before she returned to work, she filed a formal EEOC Charge explaining the facts including the facts about Officer Wright. Dkt. 116-16. When she returned to work, she also told the facts to the warden. Dkt. 116-2 at 21-22 (McCracken Dep. 81:1-85:19). The Defendant should have terminated Wright. But the Defendant failed to take any action against Wright. *Id.* at 32-33 (McCracken Dep. 125:17-129:18); Dkt. 116-4 at 16-17 (Goss Dep. 64:18-66:13).

The Defendant argues that nothing was done to Officer Coons because he had resigned later, but the fact that a harasser resigns does not eliminate the need to investigate the harassment at the employer and provide relief to the victim. On the contrary, the fact that an accused harasser resigns adds to a reasonable inference that he harassed the victim. The employer can investigate, including talking to the accused employee before or after he leaves the employer; place information in the former employee's file; find the former employee as ineligible for rehire; refer the harassment information to appropriate authorities; provide apologies, counseling, leave, and other accommodations to the victim; and improve supervision, training, policies, and procedures. The Defendant in this case did nothing with respect to the actions of Officer Coons, allowing offenders to talk about McCracken's ass all day on the day before she came to work. Dkt. 116-2 at 18, 21-22 (McCracken Dep. 70:1-71:1, 84:16-85:11).

In its list of co-worker sexual acts, the Defendant discusses Officer Harris last, even though he was one of the first harassers. Dkt. 65 at 17:11-19. The Defendant argues that after Plaintiff complained to HR Generalist Goss, Goss investigated. However, Goss made a finding that the allegations were unfounded, even though Goss required Harris to attend harassment prevention training, told him to leave his personal life at home, and told him that Plaintiff was

not interested in any kind of romantic or sexual relationship. *Id.* Goss testified that when there

was not another witness in addition to the victim there to see the harassment, they could not

substantiate for sure that it happened. Dkt. 116-4 at 8-12 (Goss Dep. 30:13-45:3). The DOC

policy fails to recognize that the victim is a witness. *Id.* The DOC policy fails to recognize the

escalating sexual harassment and retaliation.

Goss told Plaintiff that she could transfer or stay on the same shift and remain

professional, instead of transferring Harris. Dkt. 116-2 at 9 (McCracken Dep. 33:24-35:3). Harris

also continued to harass Plaintiff and interfere with her performance by delaying Plaintiff from

entering the Defendant's gate and failing to do his duty by picking up chemical trays from her.

*Id.* at 12-13 (McCracken Dep. 48:14-49:10); Dkt. 116-1 at ¶¶ 22-25. Harris continued to harass

Plaintiff by stomping around and slamming doors, making her feel intimidated. *Id.* The

Defendant allowed Officer Harris to work until he was arrested for passing a school bus, and the

Defendant allowed him to take leave, allowed him to resign, and listed him as eligible for rehire.

Dkt. 116-1 at ¶¶158-159; Dkt. 116-29. The Defendant gave Plaintiff no correction of the

discrimination and harassment. Dkt. 116-2 at 9, 11 (McCracken Dep. 34:1-35:3, 44:14-25); Dkt.

116-7. Instead, the Defendant allowed Lieutenant Pinkston, who took her complaint about

Harris, to tell other employees to not be alone with Plaintiff, which further humiliated her, hurt

her reputation, and deterred her from complaining again. *Id.*

The Defendant lists three instances involving Pinkston. Dkt. 65 at 17:20-18:12. The first

instance the Defendant lists is saying that Plaintiff was not allowed to be left alone with another

officer, as they already had one sexual harassment incident report being filed by her. *Id.* The

Defendant argues that Pinkston denied making the statement, but the Defendant ignores that

other employees also complained about it to the Defendant. Dkt. 116-9. HR Generalist Goss only

advised Pinkston to "not say anything like that." Dkt. 116-4 at 14 (Goss Dep. 56:5-17). The

Defendant did not discipline Pinkston. Dkt. 116-35. The Defendant did not correct Pinkston's statement to other officers. The Defendant did not apologize to Plaintiff. The Defendant did not correct Pinkston's statement that affected Plaintiff's work performance, humiliated her, and made her afraid of other officers. The Defendant allowed Pinkston to increase the harassment and retaliation against Plaintiff.

The Defendant lists the second incident as telling Plaintiff that he would never train her or any female to work in a segregation unit and telling her that if she complained of discrimination, he would just say that she was upset that he would not let her give him a blow job in the parking lot. Dkt. 65 at 18:1-9. The Defendant argues that this is not a credible statement for him to make, because correctional officers and lieutenants are in separate parking lots, but there was nothing in his statement that both of their cars had to be in the same parking lot for a blow job to occur. Furthermore, motions for summary judgment cannot decide issues of credibility. *Malin, supra; Miller, supra.* Plaintiff could not complain, and she was afraid of being falsely accused, so her supervisor's statements caused her to resign. Dkt. 116-12. When Plaintiff filed an EEOC charge, returned to work, and told the warden the facts, the Defendant still did not take corrective action against Pinkston. Even after Lane later complained about Pinkston and Lieutenant Lowe discouraging her from complaining to HR, the Defendant only demoted Pinkston and Lowe and still did not provide any relief to Plaintiff. Dkt. 116-30; Dkt. 116-31; Dkt. 116-32; Dkt. 116-33. Pinkston caused the constructive discharge of McCracken, increased the harassment and retaliation against Plaintiff, delayed her training, and caused her termination, and the Defendant still did not take any action against Pinkston for his actions against Plaintiff and did not give Plaintiff any relief.

The Defendant lists a third incident involving Pinkston as him tugging McCracken's hair and asking her "what is this?" Dkt. 65 at 18:9-12. The Defendant claims that HR Generalist Goss

counseled him not to touch anyone's hair. *Id.* However, Goss did not investigate the incident and did not write anything about it, because she claimed that the assault by pulling the female victim's hair "didn't rise to the level of needing it." Dkt. 116-4 at 20-21 (Goss Dep. 80:3-83-4). That was the third physical assault of Plaintiff, after Officer Harris grabbed her from behind around her neck and pulled her backside to his frontside and after Officer Wright grabbed her butt. The third physical assault was her supervisor grabbing her by her hair after she had complained about the assaults by Officer Harris and Officer Wright. The Defendant allowed Pinkston to delay her training; stand staring at her for a long time; watch her closely by video cameras; and transfer her former boyfriend to her unit after she transferred away from him, was separated from her husband, and was isolated from other employees by the Defendant, causing her termination.

The Defendant argues that Lieutenant Pinkston's statements and actions did not rise to the level of creating a hostile work environment because a reasonable person likely would not have found her work environment to be hostile. Dkt. 65 at 18:13-15. The Defendant does not dispute that Plaintiff found her work environment to be hostile. *Id.* A reasonable person would also have found it to be hostile, especially after requests for sex; three sexual assaults; her supervisor telling other employees not to be alone with her because she complained about sexual harassment; another employee making nasty sexual statements about her and endangering her safety by telling offenders personal information about her identity, location, and children; the supervisor's threat to make a false sexual allegation against her if she complained again; humiliating her; affecting her performance; causing her panic attacks and a constructive discharge; the supervisor delaying training and making false negative statements about her; the supervisor silently staring at her for a long time; the Defendant telling Plaintiff not to talk about the harassment to anyone except a supervisor; isolating the victim; causing the victim's divorce;

28

the supervisor watching her closely on video cameras; putting her former boyfriend in her unit after she transferred away from him; falsely accusing her of trafficking drugs; and causing her termination.

The Defendant quotes *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902-903 (7th Cir. 2005), but the remarks in that case did not involve plaintiff and did not involve remarks that she heard. *Id.* That case certainly did not involve the assaults against plaintiff, statements directly against plaintiff, statements endangering the safety of plaintiff and her children, humiliation, affecting performance, causing a constructive discharge, statements causing plaintiff's divorce, statements causing plaintiff to be unable to come to work on some days, statements causing plaintiff panic attacks and to bleed through her pants, setting her up by transferring her former boyfriend in the unit she had transferred to, causing a false confession, and causing plaintiff's termination.

The Defendant also cites *Vance v. Ball State University*, 570 U.S. 421, 427 (2013), but that case did not involve the actions and statements like those in this case. The warden also said he would take the statements of the men harassers over the statements of the female Plaintiff. The Defendant did not even give Plaintiff relief after Sadie Lane complained to the Defendant about similar actions by Lieutenant Pinkston. Even after the Defendant found that Pinkston lied, was dishonest, and obstructed an investigation, in addition to McCracken's evidence against him, the Defendant did not terminate him and only demoted him and allowed him to transfer to another facility. Dkt. 116-31; Dkt. 116-33; Dkt. 116-35 at 1-4. The Defendant never gave Plaintiff a remedy for the discrimination and retaliation against her.

In determining sexual harassment, the Supreme Court in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993) made clear that the jury must look at all of the circumstances, and no single factor is required.

"But we can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."

510 U.S. at 23. Illegal harassment need not be both severe and pervasive. *Worth v. Tyler*, 276 F.3d 249, 267-268 (7th Cir. 2001). However, there is evidence that the sexual harassment of McCracken was both severe and pervasive.

In the case of McCracken, there is evidence that the discriminatory conduct was not only physically threatening, she actually suffered several physical assaults, including Harris touching her inner thigh, Harris grabbing her from behind around the neck and pulling her backside to his frontside, Wright caressing her inner thigh, Wright grabbing her butt, and her supervisor, Lieutenant Pinkston, grabbing her hair and tugging on it. Dkt. 116-1 at ¶¶10-12, 58-61, 119.

The evidence shows that the actions against McCracken were humiliating by the multiple physical assaults; by an employee telling offenders that she was a terrible sexual name that she was trying to have sex with higher ups so she could move up the ladder, and where she lived and her personal relationships; her supervisor Pinkston telling employees not to be alone in any room with her because she had filed a complaint of sexual harassment; by being denied relief breaks so much that she bled through her clothing; by an employee telling her that the offenders talked all day about her ass; by being transferred because of the statements allowed about her ass; by being told by her supervisor that if she complained to HR about discrimination, he would say that she reported him because he would not let her give him a blow job; by having to resign so that false allegations were not made against her by her supervisor; by the warden telling her that he did not have any reports from her and her having to give him copies that he and HR should have had and

30

read; by being told not to talk to anyone, including her husband, about her complaints; by statements of employees about her marriage; by her divorce caused by the sexual harassment; and by discriminatory and false allegations against her. *Id.*; Dkt. 116-1 at ¶¶42-43, 46-48, 70-71, 74-79, 86-88, 90-93, 108-111, 132-136, 141-142.

There is evidence that the sexual harassment interfered with her work performance by Harris not letting her in the gate until another employee came to the gate, Harris not performing his duties in relation to her work with the chemical trays, the Defendant telling her that her choice was to transfer instead of the Defendant transferring Harris, by her being afraid to work with Wright after his requests for sex and his physical assaults, by being denied relief from working with Wright, by being denied relief for bathroom breaks and bleeding through her clothing, by being delayed relief for a safety confrontation with an offender, by her supervisor Pinkston telling her that if she complained to HR, he would make a false allegation against her, by her anxiety and panic attacks causing her to miss roll call and miss days of work, by her constructive discharge because of not being able to work, by being denied leave to recover from the sexual harassment, by being denied other leave, by being denied investigations of her complaints, by Pinkston denying her training, by Pinkston making negative statements at her firearms review board and causing her to fail the first time, by moving Boaz into her unit for no legitimate reason after she had transferred away from his unit, by repeated phone calls to McCracken about her divorce, by allegations against her for communicating with Boaz after the defendant moved Boaz into her unit, by a false allegation against her of drug trafficking, and by her termination. Dkt. 116-1.

<blockquote>

**B.      There is evidence that Ms. McCracken was subjected to discrimination based on her sex.**

</blockquote>

The Defendant does not dispute that the certain actions of the Defendant are adverse

actions that altered the terms and conditions of Plaintiff's employment. Those actions that are not disputed as adverse are the transfer of Plaintiff because she complained about sexual harassment, the denial of leave, the constructive discharge, the denial of training, and the termination. Dkt. 65 at 20.

As justification for the denial of training, the Defendant argues that Captain Wheeler's decision to deny training was based on her receipt of discipline, but McCracken had not received discipline. Dkt. 116-2 at 19-22 (McCracken Dep. 75:13-85:19). The only failure that McCracken had was the failure to report for roll call, but that was because of the sexual harassment, anxiety, and panic attacks, and the Defendant refused to grant McCracken her leave even for her wedding but granted the Defendant granted leave to her male fiancé. *Id.* McCracken testified that Captain Wheeler's decision was appropriate if she had discipline, but she did not have discipline and her failures to meet roll calls were due to the sexual harassment.

The Defendant argues that the decision to terminate McCracken was based on her inappropriate relationship with an offender and trafficking with an offender. But the Defendant was the one that moved her former boyfriend to her unit after she had transferred from his unit in order to not have an inappropriate relationship with him. It was the Defendant that set her up and caused the inappropriate relationship by not correcting any of the sexual harassment and retaliation against her, causing her anxiety and panic attacks, not granting her leave, isolating her, and placing her former boyfriend with her. Dkt. 116-2 at 36-43 (McCracken Dep. 144:1-169:15).

It was the Defendant that told McCracken that it knew that she was trafficking drugs and that if she did not agree with the Defendant, there would be bad consequences for her, so she agreed with the Defendant in order to pick up her children. *Id.* McCracken's termination would not have occurred if she had not been repeatedly sexually harassed, retaliated against, and set up

for termination. *Id.*

When an investigator tells an employee to just confess because the investigator knows that the employee did it, the investigator is not investigating, but rather, attempting to bolster the employer's predetermined outcome to terminate the employee. *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 646-647 (7th Cir. 2013). A jury could infer from this departure from policy that the employer's predetermined outcome was discriminatory. *Id.*

Lieutenant Pinkston and the facility had determined to terminate McCracken for her complaints and tried to get more reasons against her. Pinkston watched McCracken closely, moved her former boyfriend to the unit where McCracken had moved to be away from him, and let McCracken communicate with him by monitored phone for several days without objecting to her. The investigator then falsely told McCracken that he knew that McCracken was bringing drugs into the facility, when she was not, and persuaded her to agree in order for her to leave to go home with her children. Dkt. 116-2 at 36-37 (McCracken Dep. 144:17-147:16).

The Defendant argues that Plaintiff was not meeting the employer's legitimate expectations because it terminated her, but that is a circular argument. If being terminated was proof that an employee was not meeting the employer's expectations, no one who was terminated would be able to show that she was meeting the employer's legitimate expectations. *Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993); *Echols v. Select Beverage, Inc.*, 64 F.Supp.2d 807, 812 (S.D.Ind. 1998). The meeting legitimate expectations means other than the discriminatory act of termination. Before the retaliatory termination, the Defendant gave Plaintiff a performance rating of meets expectations with ratings of exceeds expectations for customer service and interpersonal relations. Dkt. 116-20. Just a week before the termination, the Defendant gave her a spot bonus award for teamwork. Dkt. 116-1 at ¶138.

A week later, employees refused to cover her post to relieve her, and she complained to

33

the Defendant. Dkt. 116-1 at ¶¶139-145. Two days later, the Defendant suspended her. *Id.* Very close timing to complaints is sufficient evidence of discrimination and retaliation. *Loudermilk v. Best Pallet Co.*, LLC, 636 F.3d 312, 315 (7th Cir. 2011). Also, in McCracken's case, she has many other pieces of evidence of discrimination and retaliation, including Lieutenant Pinkston's admissions that he would never train any female in the restricted units and that if she complained about discrimination to HR, he would make a false allegation against her. Dkt. 116-2 at 21-22 (McCracken Dep. 83:15-85:19).

The Defendant argues about legitimate expectations, but the Defendant's actions of sexually harassing, discriminating, and retaliating against Plaintiff, including making false allegations against her and setting her up for termination are not legitimate expectations.

### 2.      There is evidence that Ms. McCracken was subjected to retaliation.

The Defendant repeats its argument that Plaintiff believed that Captain Wheeler's response to the denial of training was appropriate, but McCracken testified that Wheeler mistakenly believed that she was not eligible for training because she had discipline, but she did not have discipline. Her missing some roll calls was due to the sexual harassment, anxiety, panic attacks, and inability to get to work. Dkt. 116-1 at 19-22 (McCracken Dep. 75:13-85:19).

The Defendant argues that to the extent that the denial of relief was retaliatory, it was an action taken by six to nine employees, but they were employees of the Defendant refusing relief after the Defendant allowed Plaintiff to be assaulted, humiliated, disparaged, isolated, and targeted.

Even after the Defendant found that Pinkston also told Sadie Lane not to complain to HR and that he lied and obstructed that investigation as well, the Defendant still failed to fully investigate and correct the discrimination and retaliation against Plaintiff. Dkt. 116-30.

## **<u>Conclusion</u>**

There is evidence that McCracken was subjected to a hostile work environment, sex

discrimination, and retaliation. For all of the above reasons, the Defendant's Motion For

Summary Judgment should be denied.

Respectfully submitted,


 s/ Richard L. Darst
Cohen Garelick & Glazier
8888 Keystone Crossing Boulevard
Suite 800
Indianapolis, Indiana  46240-4636
Telephone (317) 573-8888
Facsimile  (317) 574-3855
Email rdarst@cgglawfirm.com