UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

AMBER MCCRACKEN,           )
                          )
              Plaintiff,   )
                          )
        v.                 )        No. 1:19-cv-02290-JRS-MG
                          )
STATE OF INDIANA,          )
                          )
              Defendant.   )

## Order on Motion for Summary Judgment

Plaintiff Amber McCracken[1] worked as a correctional officer for the Indiana Department of Correction ("IDOC").  She sued the State of Indiana under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*., alleging the State discriminated against her because of her sex and retaliated against her for exercising her Title VII rights.  Currently before the Court is the State's motion for summary judgment.  (ECF No. 62.)  For the following reasons, the motion is granted in part and denied in part.

## I.    Background

McCracken worked at the IDOC from November 2017 until her termination in July 2019.  (McCracken Aff. ¶¶ 4, 153, ECF No. 116-1.)  She alleges that during her employment, she was subjected to a hostile work environment; experienced numerous

---

[1] The Court recognizes that Amber McCracken was born Amber Grayless and currently uses that name.  (McCracken Aff. ¶¶ 1–3, ECF No. 116-1.)  The Court refers to her by her married name of McCracken in this Order, however, since she was known by that name at the time of many of the relevant incidents and was referred to by that name in the parties' materials and evidence.

incidents of sex discrimination, including her eventual termination; and was retaliated against for complaining about those harassing and discriminatory incidents.

The following facts are construed in the light most favorable to McCracken, the non-moving party. All incidents are relevant to McCracken's experience and claims, but of particular importance are those incidents involving McCracken's supervisor, Lieutenant Pinkston, and fellow correctional officers Harris and Wright.

A. *Incident One: Officer Robertson – "ass against the wall"*

The first incident occurred in December 2017, just weeks after McCracken began her employment. Officer Robertson ordered McCracken "to put [her] ass against the wall" because he "couldn't concentrate on what was going on around him." (McCracken Dep. 21, ECF No. 116-2.)

While another present officer said nothing at the time, McCracken later told the officer that Robertson's comment made her feel uncomfortable. (*Id.* at 22–24.) The officer apologized and spoke with Robertson, who also apologized. (*Id.*) McCracken does not think IDOC should have taken any further action on this incident. (*Id.*)

B. *Incident Two: Officer Harris – assault*

On February 5, 2018, McCracken was sitting in a desk chair while making a telephone call. Officer Harris approached and sat on the desk. He put his hand on McCracken's inner thigh and slid his hand down her thigh to her knee. (*Id.* at 26.) McCracken hung up the phone, stood up, and walked toward the door. (*Id.* at 26–27.) As McCracken was attempting to leave, Harris wrapped his arm around her neck,

pulled the back of her body against the front of his body, placed his head near her shoulder, and breathed heavily into her ear.  (*Id.*)  McCracken stepped away and told Harris not to touch her.  (*Id.*)

The same day, McCracken contacted her sergeant about the incident and requested that he bring in another sergeant with whom she would feel comfortable speaking.  (*Id.* at 27–28.)  When McCracken started to recount the incident, the second sergeant stopped her and said he wanted to bring in someone he trusted to handle the situation appropriately.  (*Id.* at 29.)  He brought in Lieutenant Pinkston. (*Id.*)

The next day, McCracken described the incident to Pinkston and the two other sergeants.  (*Id.* at 30–32.)  McCracken indicated that she wanted to document the incident and turn it in to the appropriate personnel.  (*Id.*)  In response, Pinkston said that he "has ways around to get it directly to human resources, so that way other people don't have to sign off on it so it doesn't get around that [McCracken] is the kind of person to make reports like this all the time."  (*Id.* at 31.)  McCracken filled out an incident report and emailed it to Pinkston.  (*Id.* at 31–32.)

Human resources generalist Kathy Goss investigated the incident.  She ultimately concluded that McCracken's allegations were unfounded because no third party witnessed the incident and no complaints had been filed previously against Harris. (Goss Dep. 43–44, ECF No. 116-4.)  Despite this conclusion, Goss told Harris to leave his personal life at home; reiterated that McCracken was not interested in any sort

of relationship; and required him to attend harassment prevention training.  (*Id.* at 47; McCracken Dep. 35, ECF No. 116-2.)

"Months" passed before McCracken and Goss met to discuss the incident. (McCracken Dep. 32–33, ECF No. 116-2.)  When they met, Goss requested that McCracken send her a copy of the incident report.  (*Id.*)  In response to questioning from Goss, McCracken expressed that she had no interest in pursuing a relationship with Harris and stated that she had not given him that impression.  (*Id.* at 33–34.) Goss then suggested that if it would make McCracken more comfortable, she could switch to a different shift or "do [her] best to remain professional" when interacting with Harris.  (*Id.* at 34.)  McCracken thought it would be unfair for her to have to switch shifts, rather than Harris, and she requested that she not be required to have any kind of interaction with Harris.  (*Id.*)  Goss informed McCracken that she had given Harris a "stern talking to" and had made it clear that McCracken was not interested and Harris should leave his personal life at home.  (*Id.* at 35.)

## C.  *Incident Three: release of personal information*

So McCracken could leave her post to discuss the Harris incident with Pinkston and the other sergeants, another officer came to relieve her.  (McCracken Dep. 40, ECF No. 116-2.)  When McCracken returned to her post the following day, two offenders informed her that the relieving officer had provided them with personal information about her.  (*Id.* at 40–42.)  The offenders stated that the relieving officer had told them McCracken's full name, where she lived, where she grew up, what school she went to, the names of her ex-husband and current partner, and that she

had children.  (*Id.* at 41–42; ECF No. 116-8.)  They also said that the relieving officer said that McCracken was a "big w****" in high school and was "trying to have sex with higher ups" so she could "move up the ladder quicker." (McCracken Dep. 41–42, ECF No. 116-2; ECF No. 116-8.)

McCracken immediately reported this to the sergeant overseeing her post. (McCracken Dep. 42–44.)  As she and the sergeant filled out an incident report, the fourth incident took place.

D. *Incident Four: Lieutenant Pinkston – "not allowed to be left alone" comment*

As McCracken and the sergeant filled out the incident report documenting the release of McCracken's personal information, Lieutenant Pinkston walked by.  He entered the sergeant's office and said that from now on, if McCracken needed to fill out an incident report, she needed to do it at the shift office because she was not allowed to be left alone with another male officer, since they already had one sexual harassment report filed by her and they "did not need another one of those." (*Id.* at 44; McCracken Aff. ¶¶ 47–48, ECF No. 116-1.)

McCracken and the sergeant filled out another incident report documenting Pinkston's statement.  (McCracken Dep. 46, ECF No. 116-2.)

McCracken states that IDOC did not take any action regarding Pinkston's statement, (*Id.* at 46–47); human resources generalist Goss said she asked Pinkston why he said that and he denied doing so, but Goss still counseled him "not to say anything like that," (Goss Dep. 56–57, ECF No. 116-4.).  McCracken similarly said IDOC took no action regarding the relieving officer's comments and release of her

personal information to offenders. (McCracken Dep. 46–47, ECF No. 116-2.) For her part, Goss said she could not investigate that incident because McCracken did not provide her with the names of the offenders who relayed the information, (Goss Dep. 55, ECF No. 116-4), although the incident report does list the offenders' names, (ECF No. 116-8.).

### E. *Incident Five: Officer Harris – checkpoint gate*

The fifth incident occurred on February 17, 2018. (McCracken Aff. ¶ 13, ECF No. 116-1.) Harris was manning a checkpoint gate and was responsible for opening the gate to allow officers to enter. (McCracken Dep. 48–51, ECF No. 116-2.) McCracken arrived at the gate, rang the buzzer, and waited at least five minutes, but Harris did not open the gate, despite McCracken standing directly in front of him, just a couple of inches away. (*Id.*) When another officer arrived and announced his presence, Harris opened the gate immediately, and McCracken was able to get through. (*Id.*) As McCracken was passing through, however, Harris "slam[med] the [nearby] door shut, and then slam[med] it open and then slam[med] it shut," which made McCracken feel intimidated. (*Id.*)

McCracken reported the incident to Pinkston, who laughed it off, said that maybe Harris didn't see her, and reminded McCracken that she needed to be professional. (*Id.* at 52–53.)

The same day, Harris called McCracken to ask if they could talk after work. (McCracken Aff. ¶¶ 16–18, ECF No. 116-1.) McCracken agreed, and when they spoke,

Harris accused her of lying to him and leading him on. (*Id.*) McCracken responded that she was sorry he felt that way, because she was not trying to lead him on. (*Id.*)

### F. Incident Six: Officer Harris – failure to pick up trays

The day after Harris did not open the gate for McCracken, he failed to pick up certain trays from her that he was supposed to pick up as part of his work duties. (*Id.* at ¶ 22.)

### G. Incident Seven: Officer Wright – intercourse comment

The next incident occurred several months later, in June or July. (McCracken Dep. 59–60, ECF No. 116-2.) Officer Wright placed his hand on McCracken's thigh and told her that they "could sneak off to the chapel if [McCracken] worked overtime and have sex." (*Id.* at 59–60, 183–84.) McCracken said that she "would never do that" and left the area. (*Id.*)

McCracken did not immediately report the incident. (*Id.* at 61–62.) She felt that, since Harris had physically assaulted her and nothing was done, nothing would be done about Wright's comment. (*Id.*) However, McCracken did ask Pinkston to be removed from the location she was currently working, and she was relocated. (*Id.* at 64–67.) McCracken did not tell Pinkston that she requested to move in order to avoid Wright. (*Id.*)

### H. Incident Eight: Officer Wright – buttocks grab

Shortly after the intercourse comment was made, as McCracken delivered medication to the facility's pharmacy, (*id.* at 67–68), Wright "grabbed ahold of" McCracken's buttocks, (*id.*). McCracken walked away. (*Id.*) She did not immediately

report this incident for the same reason as the previous incident—she thought it would be futile. (*Id.*) However, when McCracken submitted her letter of resignation in November, she recounted the incidents involving Wright. (*Id.* at 92.) They are also included in her Equal Employment Opportunity Commission ("EEOC") charge. (ECF No. 116-8.)

I.   *Incident Nine: Officer Coons – "happy to see you" comment*

In November, as McCracken and her partner were taking over for the night-shift officers, Officer Coons told McCracken that the offenders were "going to be happy to see [McCracken] when they wake up, because all day yesterday all [Coons] heard about was [McCracken's] ass." (McCracken Dep. 70, ECF No. 116-2; McCracken Aff. ¶ 74, ECF No. 116-1.)

McCracken completed an incident report. In response, Pinkston and Captain Wheeler told McCracken that they spoke with Coons and informed him that his comment was inappropriate and unacceptable. (McCracken Dep. 72–74, ECF No. 116-2.) Pinkston also said that he didn't think Coons "meant anything by it" because he was "just a weird guy" who "doesn't know how to talk to people," which McCracken found downplayed what happened. (*Id.*)

After McCracken had reported Coons's comment, but before she was called to speak with Pinkston and Captain Wheeler about the incident, she learned that her requests for time off had not been approved. (McCracken Dep. 75–78, ECF No. 116-2.) She and her then-fiancé, Officer Coty Coffman, had previously submitted requests for time off for their wedding and other events. (*Id.*) The two turned the requests in

together.  (*Id.*)  Coffman's requests were approved, but McCracken's were not—they had been "lost."  (*Id.*)  McCracken believes this was in retaliation for the incident reports she had filed.  (*Id.*)

In the meeting with Pinkston and Wheeler, McCracken indicated that she would like to receive additional training so she could expand her opportunities.  (*Id.* at 78–82.)  Wheeler said that pursuant to policy, she would not receive training until she stopped receiving discipline.  (*Id.*)  McCracken had not received any formal discipline, so she understood this to refer to her occasional absences from roll call, which she had been informed she needed to be present for.  (*Id.*)  McCracken thought Wheeler's response was appropriate, but she decided to follow up on his comments in a conversation with Pinkston, which led to incident ten.  (*Id.*)

J.  *Incident Ten: Lieutenant Pinkston – blow job comment*

When McCracken and Pinkston spoke, Pinkston confirmed that Wheeler's discipline comment referred to McCracken's roll call issues.  (*Id.* at 82–85.)  Pinkston then said to McCracken: "if it were up to me personally, I will never train you or any other female in [the segregated housing units].  And if you want, you can go tell HR that I'm discriminating against you, and I will just tell them that you were upset because I won't let you give me a blow job in the parking lot."  (*Id.*)

McCracken walked away.  The next day, she submitted a resignation letter to human resources generalist Goss, explaining that she believed she was sexually harassed and no action was taken.  (*Id.* at 91–92.)  In the letter, McCracken noted Pinkston's comment as well as Officer Wright's conduct—incidents seven and eight—

9

which she had not previously reported.  (*Id.*)  Goss apologized and indicated that she was unaware of any of the harassment and did not have copies of any of the incident reports McCracken had filed.  (*Id.* at 92–94.)

Ultimately, McCracken requested that she be allowed to take a leave of absence and then return to work.  (*Id.*)  McCracken was never granted leave, but she rescinded her resignation and returned to work about two weeks later.  (*Id.* at 95–96; McCracken Aff. ¶¶ 87–102, ECF No. 116-1.)  In the meantime, she filed a charge of discrimination with the EEOC.  (McCracken Aff. ¶ 100, ECF No. 116-1.)

When Goss spoke to Pinkston about this incident, he said he had told McCracken he would not put her in for training because of staff shortages and her unauthorized absences from work.  (Goss Dep. 72–73, ECF No. 116-4.)

Shortly after McCracken returned to work, Pinkston told her that she should not have complained.  (McCracken Aff. ¶ 105, ECF No. 116-1.)

### K.  *Incident Eleven: Warden Smith – meeting*

In January 2019, at least a month after McCracken returned to work, she had a meeting with Warden Brian Smith.  (*Id.* at ¶ 108.)  In the meeting, Smith requested that McCracken send him copies of her incident reports.  (McCracken Dep. 125–133, ECF No. 116-2.)  He said he had never seen them, had never heard about any of the harassment, and said human resources generalist Goss did not have copies either. (*Id.*)  Smith also said that it seemed like everything was handled appropriately, it was McCracken's word against the others' word, and "because their history here and their lack of discipline, it seems like their word is better than [McCracken's]."  (*Id.*)

McCracken noted that the female training coordinator present at the time also seemed "completely floored" by Smith's statements and demeanor, which McCracken described as "dismissive." (*Id.* at 129–33.)   McCracken sent the incident reports as requested and did not hear anything further from Smith. (*Id.* at 129.)

### L. *Incident Twelve: Lieutenant Pinkston – firearms review board meeting*

In January 2019, McCracken found out she would receive the training she had requested in her meeting with Lieutenant Pinkston and Captain Wheeler; but first, she had to pass an evaluation with the firearms review board. (*Id.* at 97–101.) Pinkston and two officers evaluated McCracken. (*Id.*)   She answered their questions as best she could, but after two questions, Pinkston interrupted her during the middle of her response and said that if McCracken wasn't going to take it seriously, they might as well stop the review because there would be no point in continuing. (*Id.*) Her confidence dissipated, and the panel concluded that she "was not equipped mentally to handle the responsibility of a firearm." (*Id.*)   About a month later, McCracken redid the evaluation in front of a panel without Pinkston and passed. (*Id.*)   She believes Pinkston interrupted her evaluation because she had previously reported his conduct. (*Id.*)

### M. *Incident Thirteen: Lieutenant Pinkston – removal from training and staring*

Since McCracken passed the firearm evaluation, she was scheduled in May for the training she requested. (McCracken Dep. 103–05, ECF No. 116-2.)   The day before the training, she was informed by the sergeant in charge of the training that she was removed from the list of attendees by Pinkston. (*Id.*)   She called Captain Wheeler,

who had originally said she needed to avoid discipline to be eligible for training, and asked why she had been removed.  (*Id.*)  He responded that he was not aware she had been removed and he still expected her to be at the class.  (*Id.*)  McCracken ultimately received the training.

The day McCracken spoke to Captain Wheeler to ask why she had been removed, Pinkston showed up to the area McCracken was working.  (*Id.*)  McCracken was filling out paperwork and interacting with offenders.  (*Id.*)  Pinkston proceeded to stare at her, without speaking to her, for thirty to forty-five minutes.  (*Id.*)  McCracken did not report this incident.

### N. *Incident Fourteen: Officers Moon, Bauer, Coffman – phone calls*

The next incident occurred in June and July.  (*Id.* at 109–118.)  At this time, McCracken was having problems with her then-husband, Officer Coffman.  (*Id.*)  Over the course of several weeks, McCracken received multiple calls to the area she was working from Coffman and fellow Officers Moon and Bauer, questioning her relationship with Coffman.  (*Id.*)  McCracken noted she "wasn't able to do [her] job" due to the interruptions, and she felt it was inappropriate for these conversations to take place at work.  (*Id.*)  She filed an incident report and told the officers not to contact her about anything that was not related to work, and they complied.  (*Id.*)

McCracken considers these incidents harassment, but not necessarily sexual harassment.  (*Id.*)

### O. _Incident Fifteen: Lieutenant Pinkston – hair pulling_

McCracken typically wore her hair up, but she wore it down, albeit in compliance with IDOC policy, one day in June or July.  (McCracken Dep. 119–24, ECF No. 116-2; Def.'s Mem. 11, ECF No. 65.)  Pinkston walked up behind her, grabbed her hair, and said, "what is this?"  (McCracken Dep. 119, ECF No. 116-2.)  McCracken jerked away and walked off.

McCracken submitted an incident report but did not hear anything back. (McCracken Dep. 122, ECF No. 116-2.)  Goss stated that she spoke with Pinkston, who said he "reach[ed his] hand up and touch[ed] her hair and sa[id] 'these cornrows or whatever the style [is]' are not within policy."  (Goss Dep. 80–82, ECF No. 116-4.) Goss told him that in the future, he probably should not touch anybody's hair.  (_Id._)

### P. _Incident Sixteen: restroom relief_

McCracken notes that on multiple occasions, other officers would not cover her post so she could use the restroom.  (McCracken Aff. ¶¶ 70–73, ECF No. 116-1.)  She would sometimes call five to nine people before she could find relief.  (McCracken Dep. 191, ECF No. 116-2.)  She did not have trouble securing coverage until she complained about the harassment she experienced.  (McCracken Aff. ¶¶ 70–73, ECF No. 116-1.)  She also stated that after she complained about the harassment, the demeanor towards her from other officers "completely changed."  (McCracken Dep. 189, ECF No. 116-2.)  They were no longer as friendly or approachable as they had been previously.  (_Id._)

McCracken completed an incident report documenting one specific incident, on July 6, 2019, where she was denied relief for so long that she bled through her clothing due to her menstrual cycle. (ECF No. 116-24.) On that date, McCracken's shift was from 5:45 AM to 6:00 PM, but she was only able to go to the restroom once, around 4:00 PM. (McCracken Aff. ¶¶ 132–34, ECF No. 116-1.)

McCracken stated that these incidents occurred often, "at least every shift." (McCracken Dep. 186, ECF No. 116-2.) At the time, her sergeant's direct supervisor was Lieutenant Pinkston. (*Id.* at 185.) McCracken further stated that officers in other units were able to secure relief. (*Id.*) She believes that Pinkston was interfering with the process because she had complained, although no officers ever indicated that was the reason they were not able to cover for her. (*Id.* at 189–92.)

Goss spoke with the higher-ups, who advised all females to contact their sergeant for relief, and in the event their sergeant is unavailable, to proceed up the chain of command. (Goss Dep. 85–86, ECF No. 116-4.)

Q. *McCracken's termination*

McCracken was terminated in July 2019 for two reasons: having inappropriate contact with an offender and admitting to trafficking suboxone into the correctional facility. (ECF No. 116-28.)

1. Relationship with Erik Boaz

McCracken and offender Erik Boaz had gone to school together and were friends. (McCracken Dep. 137, ECF No. 116-2.) McCracken learned he was at the facility in

August 2018 and completed a form indicating that she knew him, pursuant to IDOC policy. (*Id.* at 150–51.) The two did not have contact until May 2019. (*Id.*)

In May, when McCracken was told that Pinkston had removed her from the training program she had requested—designated previously as incident thirteen—she had an anxiety attack inside of her dorm, where the offenders are located. (McCracken Dep. 150–52, ECF No. 116-2.)   Boaz saw this, asked if McCracken wanted to talk, and the two had a conversation. (*Id.*)

McCracken then requested that she move dorms, as she knew it was inappropriate for her to confide in an offender. (*Id.*) She called Captain Wheeler and requested to be relocated but did not explain why. (*Id.* at 153–54.) McCracken was moved, but the very next day, Boaz was moved into her new unit. (*Id.*) McCracken noted this was unnecessary because Boaz had already completed the program offered in her unit. (*Id.*)

The two then communicated, both while McCracken was at work and while she was not. (*Id.* at 138–42.) To communicate outside of work, McCracken used a messaging app, which she signed up for using a name, phone number, and address that were not hers. (*Id.*) McCracken also used this account to provide funds to Boaz. (*Id.*) McCracken knew that she was not permitted to provide funds to offenders without authorization, which she did not have, and she knew an undisclosed relationship with an offender would result in termination. (*Id.*; *Id.* at 157–58.)

McCracken maintains that the relationship would not have happened if it weren't for the sexual harassment and retaliation she experienced. (*Id.* at 151.) She also

15

believes that Pinkston was responsible for moving Boaz into the new dorm after she had requested relocation.  She believed that Pinkston was watching the cameras in her dorm to monitor who she was speaking with, saw her speaking with Boaz, and wanted him to be moved to induce her into a prohibited relationship.  (*Id.* at 154–57.) McCracken believed Pinkston was monitoring her because in the past, he had said things like, "I'm watching the camera. Tell that person to put their feet down off the chair" or would ask why McCracken had not been up and walking around.  (*Id.*)

    2.  <u>Suboxone Trafficking</u>

After McCracken's relationship with Boaz began, allegations were made that McCracken trafficked suboxone into the facility.  (*Id.* at 143–50.)  IDOC conducted an interview with McCracken.  At first, McCracken denied having any involvement.  (*Id.*) After pressure from the investigator, who told McCracken that "the only way" he could get her out of the interview so she could leave to pick up her children was if she "g[a]ve [him] the answers that [he] need[ed] to hear," McCracken confessed to the trafficking.  (*Id.*)  She maintains that this was a false admission and that she "just said whatever [the investigator] needed to hear" so she could leave the meeting to pick up her children.  (*Id.*)

*R.  Post-Termination Information*

In October, another female officer reported an incident of sexual harassment to Pinkston.  (ECF No. 116-30.)  In response, Pinkston told her "not to take it upstairs (to HR), we can settle it here."  (*Id.*)  Pinkston also told human resources that he did not know about the incident, but later acknowledged that he did in a subsequent

conversation.  (*Id.*)  Human resources concluded that "Pinkston was dishonest in his statements and impeded the investigation with his false reporting" and never "report[ed] the incident to HR or encourage[d the female officer] to report it."  (*Id.*)  Because "a supervisor of his level . . . should have brought the allegation to HR's attention himself," and should not have withheld information or acted dishonestly, Pinkston was demoted from lieutenant to officer.  (*Id.*)

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party must inform the Court of the basis for its motion and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the non-moving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

A party may support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being

considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

The Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Court is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion.  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   Discussion

Title VII, in pertinent part, prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).  It protects employees from both discriminatory "tangible employment actions," like termination, and from a hostile work environment that is "sufficiently severe or pervasive to alter

the conditions of the victim's employment." *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  It also protects those who report or oppose their employer's discriminatory behavior from retaliation for doing so.  42 U.S.C. § 2000e-3(a).

McCracken claims she was subjected to a hostile work environment; experienced numerous incidents of sex discrimination, including her eventual termination; and was retaliated against for complaining about the discrimination she experienced.  The Court will address each claim in turn.

A. *Sexual Harassment*

To succeed on a hostile work environment claim, a plaintiff must show: "(1) unwelcome harassment; (2) based on a protected characteristic; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability." *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 976 (7th Cir. 2021).  A hostile work environment claim "requires a consideration of all the circumstances, because in the end it is the employer's liability that is at issue, not liability of particular employees." *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), *aff'd on other grounds*, 570 U.S. 421 (2013).  Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Demkovich*, 3 F.4th at 976 (citing *Harris*, 510 U.S. at 23).

1. Severe or Pervasive Sexual Harassment

19

Courts have recognized that "drawing the line" between lawful and unlawful sexual harassment is not always easy. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010). The Seventh Circuit has helped set out a frame of reference:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

*Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). "Perhaps the most heavily emphasized factor in our cases is whether there was inappropriate touching." *Id.*

McCracken's experience includes incidents across the spectrum. On one hand, she experienced multiple instances of nonconsensual physical contact: Harris sliding his hand down her inner thigh and then, when McCracken tried to leave, wrapping his arm around her neck and pulling the back of her body against the front of his and breathing into her ear (incident two); Wright placing his hand on McCracken's thigh (incident seven) and later grabbing McCracken's buttocks (incident eight); and Pinkston pulling McCracken's hair (incident fifteen). These may not have involved touching of "an intimate body part" like the breast or genitalia, *id.*, but physical contact "increases the severity of the situation." *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001).

McCracken also experienced fallout from rejecting Harris's advances, which is properly considered sexual harassment, despite the State's assertion otherwise. (Def.'s Mem. 16, ECF No. 65); *see, e.g.*, *Castrillon v. St. Vincent Hosp. & Health Care*

*Ctr., Inc.*, 51 F. Supp. 3d 828, 841 (S.D. Ind. 2014) (considering harassment plaintiff experienced after rejecting supervisor's sexual advances as part of sexual harassment claim).   Harris refused to open the checkpoint gate for McCracken but let a male officer through immediately, then slammed the door as she walked by (incident five).   The same day, Harris accused McCracken of lying to him and leading him on.   And the day after, Harris did not pick up items from McCracken that he was supposed to as part of his duties (incident six).   While not flagrant misconduct, these incidents are properly considered as part of the puzzle.

On the other side, some incidents likely fall into the "occasional vulgar banter of coarse or boorish workers" category: Robertson's comment that McCracken should "put [her] ass against the wall" because it prevented him from concentrating (incident one); Coons's remark that the offenders would be "happy to see" McCracken because all he heard about yesterday was "[McCracken's] ass" (incident nine).

And some incidents lie somewhere in the middle.   There is Wright's "uninvited sexual solicitation," where he told McCracken they could "sneak off to the chapel" and have sex (incident seven).   There are also incidents that appear to arise out of sexual animus or stereotyping, rather than sexual desire, though that makes them no less relevant.   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.").   That includes Pinkston's comments that McCracken was not allowed to be left alone with another male officer, since she had already filed one harassment report (incident four); his comment that if it were up to

him, he would never train McCracken or any other female in the segregated housing units, and if she wanted to tell human resources he was discriminating, he would just tell them she was upset he would not let her give him a blow job (incident ten); his interruption in the firearms review board meeting (incident twelve); his removal of her from the training list (although she ultimately received the training) and subsequent staring at her for up to forty-five minutes (incident thirteen); and the warden's comment—as he reviewed McCracken's harassment reports—that it was McCracken's word against the harassers' and the harassers' word seemed better (incident eleven).

The State argues that much of Pinkston's behavior cannot be considered sexual harassment.  (Def.'s Mem. 16, ECF No. 65.)  Notably, however, it does not contest that the following of Pinkston's actions can be: pulling McCracken's hair; his comment that he would never train a female in the segregation unit and he'd tell human resources McCracken tried to give him a blow job if she complained; and his comment that McCracken cannot be left alone with a male officer.  "[F]orms of harassment that might seem neutral in terms of race (or sex or other protected status) can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status."  *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896–97 (7th Cir. 2016).  If a jury concludes that Pinkston harassed McCracken because of her sex in some instances, it can reasonably infer that sex played a role in *all* of Pinkston's actions, even those that are less "obviously sexist."  *See Hall v. City of Chicago*, 713 F.3d 325, 334 (7th Cir.

2013) (conduct that suggests animus toward plaintiff's sex permits a jury to conclude that sex played a role in all of defendant's actions toward that plaintiff). Therefore, at this stage, those incidents can be considered in assessing McCracken's hostile environment claim.[2]

The State also argues that Warden Smith's comment that it was McCracken's word against the harassers' word and "their word is a little bit better" was not sexual harassment. And a jury might agree and find that it was not sexual harassment. But a jury could also find that Smith discounted McCracken's word because she was a woman. Despite not reviewing any of the incident reports or conducting any additional investigation, Smith made an on-the-spot assumption that the men's word should be believed over McCracken's. McCracken testified that Smith's response was "dismissive" and noted that the other woman in the room, a senior human resources representative, also appeared "completely floored" by Smith's response. A reasonable jury could conclude that Smith treated McCracken differently than he would have treated a man who complained of sexual harassment. As the party opposing

---

[2] To the extent some of Pinkston's actions appear retaliatory, rather than strictly sex-based, the Seventh Circuit has indicated it is appropriate to consider all of his conduct when evaluating whether a hostile environment was created. *See Robinson v. Perales*, 894 F.3d 818, 829–30 (7th Cir. 2018) (finding district court erred in classifying supervisor's conduct as either retaliation or harassment instead of considering it in totality for purposes of harassment claim). However, the retaliating supervisor in *Robinson* was the original harasser; when someone who was not involved in the initial harassment begins to retaliate, that retaliation cannot necessarily be considered sexual harassment for purposes of the hostile environment claim. A showing that "post-complaint harassment would not have occurred but for" the plaintiff's complaining of sexual harassment is "too remote of a connection" to sex to convert the retaliatory harassment into sex-based harassment. *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001). McCracken asserts that she was denied relief to use the restroom out of retaliation, but she does not claim that any of the officers involved initially harassed her. (To the extent she claims Pinkston played a role in orchestrating the denial of relief, it is too speculative an inference for the Court to draw.) The same is true for McCracken's assertion that she was denied leave. Therefore, those two incidents should be considered as part of McCracken's retaliation claim, but not her harassment claim.

23

summary judgment, McCracken is entitled to have that reasonable inference drawn in her favor.

Some incidents, however, cannot be considered sexual harassment or cannot be considered by the Court. The comments that McCracken was a "big w****" in high school and was "trying to have sex with higher ups" to "move up the ladder," while grounded in gender stereotypes, are inadmissible hearsay. *See* Fed. R. Civ. P. 56(c); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (noting that "a court may consider only admissible evidence in assessing a motion for summary judgment" and hearsay is inadmissible). Offenders told McCracken that another officer told them these things and released McCracken's personal information, but the offenders themselves have not filed affidavits or declarations. *See, e.g.*, *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (plaintiff's affidavit stating that she had been told by another employee that a competition existed to see who would have sex with her first was properly treated as hearsay). Therefore, the Court cannot consider this incident (incident three) in assessing whether McCracken has shown a hostile environment.

Nor can the delay of training (incident nine) or calls from other officers about personal matters (incident fourteen) be considered sexual harassment. Captain Wheeler said that pursuant to policy, McCracken would not be eligible for training until she resolved her disciplinary problems, which she understood to refer to her issues with missing roll call. She resolved her roll call issues and received the training. Moreover, she stated that she believed Captain Wheeler's response was

appropriate and that he had no alternative motivation other than attempting to comply with policy. (McCracken Dep. 81–82, ECF No. 116-2.)  Nothing connects the delay in training to McCracken's sex.  As to the calls from other officers, McCracken said that they were harassing generally, but not sexually. (McCracken Dep. 113, ECF No. 116-2.)  Without some tie to McCracken's sex, these incidents cannot be considered *sexual* harassment.

All told, the incidents began just weeks after McCracken started with IDOC and continued until her termination almost two years later, albeit with occasional incident-free periods in between.   Incidents varied in severity from offensive utterances to nonconsensual physical contact, and the perpetrators ranged from fellow officers to the warden.  Some incidents were physically threatening, like when Harris wrapped his arm around McCracken's neck to pull her back toward him after she had already rejected his advance.  Others interfered with McCracken's work— Pinkston's comments on the firearm review board caused McCracken to fail and have to postpone additional training; other conduct took place in front of offenders, impliedly undermining McCracken's authority; and McCracken testified at length about how the anxiety she experienced manifested in panic attacks, some of which took place on the job, and impacted her emotional and mental health, which sometimes caused her to miss work and, at one point, submit her resignation.  This case is close, but a reasonable jury could find the harassment so severe or pervasive as to alter the conditions of McCracken's employment and create a hostile or abusive working environment.

The cases cited by the State that conclude otherwise are easily distinguishable, as they do not involve the sort of physical touching and targeting present here.  (Def.'s Mem. 18–19, ECF No. 65); *Moser*, 406 F.3d at 902–03 (no physical contact and little harassment directed at plaintiff); *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (same); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 1998) (primarily teasing and innuendos; "the most serious misconduct" of touching of buttocks "took the relatively mild form of a poke and occurred only once"); *Bozek v. Corinthian Colls., Inc.*, No. 07 C 4303, 2009 WL 377552, at *6 (N.D. Ill. Feb. 13, 2009) (primarily sexual innuendos and one hug).

In sum, the Court finds McCracken has produced sufficient evidence to raise a genuine issue as to whether she was subjected to sufficiently severe or pervasive harassment as to alter the conditions of employment and create a hostile work environment.

### 2.  Employer Liability

An employer is not automatically liable for harassment that is sufficiently severe or pervasive.  There must also be a basis for imputing liability to the employer.  The inquiry depends on whether the harassment was perpetrated by supervisors or coworkers.

The parties do not dispute that Pinkston was McCracken's supervisor.[3]  And presumably Warden Smith had the power to "take tangible employment actions

---

[3] In its memorandum, the State separates out Pinkston's conduct from that of McCracken's coworkers, then concludes that "[e]ven if Lt. Pinkston did make the statements and take the actions alleged, they

against [McCracken], *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," as well, by virtue of his position.  *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  Therefore, liability for Pinkston and Warden Smith's conduct will be measured against the standard for supervisors, and the remaining conduct will be measured against the standard for coworkers.

### i.   Supervisors

When a supervisor's harassment results in a "tangible employment action" against the employee, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," the employer is vicariously liable.  *Vance*, 570 U.S. at 429 (quoting *Ellerth*,

---

would not rise to the level of creating a hostile work environment because a reasonable person likely would not have found her work environment to be hostile." (Def.'s Mem. 17–18, ECF No. 65)  It is not clear whether the State separated the conduct solely for purposes of the liability inquiry—which is correct—or whether it contends that the coworkers' harassment should be assessed separately from Pinkston's to determine whether *each* meets the severe or pervasive threshold.  To the extent the State argues the latter, it is incorrect.  *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), *aff'd on other grounds*, 570 U.S. 421 (2013), ("[I]f we had found that [the plaintiff's] supervisors had contributed to a racially hostile work environment, that conduct would form part of the context for [the plaintiff's] claim against [her employer], just as the actions of her coworkers would.  The only reason we have divided our analysis between the conduct of supervisors and employees is to ensure that we are respecting the standards for vicarious liability that apply.");  *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 697 (7th Cir. 2001) (citation omitted) ("[W]e do not 'carve up the incidents of harassment' when determining if the harassment was severe or pervasive, [but] in order to determine whether the employer is liable we must distinguish between the harassment allegedly perpetrated by supervisors and that allegedly perpetrated by co-workers.").

524 U.S. at 760–61). When the supervisor's harassment does not culminate in a tangible employment action but creates a hostile environment, the employer is vicariously liable unless it can establish a two-part affirmative defense. *Id.* To establish the defense, the employer must show "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Id.* at 430.

To the extent McCracken argues that Pinkston's harassment resulted in a tangible employment action because he "set her up" for termination by placing offender Erik Boaz in her dorm, that argument fails and will be discussed more thoroughly when assessing the sex discrimination claim. Without another possible tangible employment action, the Court turns to whether IDOC can establish the two-part affirmative defense.

The Court need not delve too far into IDOC's prevention and correction methods because there is clearly a dispute as to whether IDOC can succeed on the second requirement. McCracken utilized IDOC's complaint procedure. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998) (unreasonable failure to use employer's complaint procedure will normally satisfy employer's burden on second element). When Pinkston told McCracken she was not allowed to be left alone with a male officer because she had already filed one complaint, she immediately completed an incident report. (McCracken Dep. 44, ECF No. 116-2.) When Pinkston told her he would never train a female in the segregated housing units and, if she complained,

he'd tell human resources she was just upset he rejected her proposal for oral sex, McCracken notified human resources generalist Goss in her resignation letter the next day.  (*Id.* at 91–92.)  When Pinkston pulled her hair, she filed another incident report.  (*Id.* at 122.)  When she heard Pinkston had removed her from the training list, she told Captain Wheeler.  (*Id.* at 103–06.)  For the incidents she did not report—Pinkston's comments in the firearms review board, Warden Smith's comments—a jury could reasonably find that McCracken did not act unreasonably in failing to report.  Thus, the State is not entitled to judgment as a matter of law on the issue of employer liability.

> ### ii.   Coworkers

When harassment is perpetrated by coworkers, the employer is liable if it was "negligent either in discovering or remedying the harassment."  *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 931 (7th Cir. 2017) (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011)).  "Put differently, 'the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.'"  *Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (quoting *Tutman v. WBBM-TV Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000)).  Here, there is evidence in the record from which a jury could reasonably conclude that IDOC failed to take prompt and appropriate action in response to at least some of McCracken's complaints.

Recall Officer Wright invited McCracken to "sneak off to the chapel" to have sex, caressed her thigh, and grabbed her buttocks.  McCracken did not report these incidents immediately, but she included them in her letter of resignation and EEOC charge.  In response, Goss stated that she talked to Wright about the intercourse comment, which Wright denied.  (Goss Dep. 65–66, ECF No. 116-4.)  Goss deemed the allegation unfounded due to the lack of a witness and did nothing further.  (*Id.*)  When asked if she investigated whether Wright grabbed McCracken's buttocks, Goss said she did not recall investigating that incident.  (*Id.* at 71.)  The record is also not clear as to whether Goss inquired about Wright touching McCracken's thigh.

A prompt investigation "is the hallmark of a reasonable corrective action." *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) (quotation omitted).  When Goss was alerted to the sexual intercourse comment, she investigated.  But it is not clear that she ever investigated the more serious reports of physical contact.  Moreover, an employer still must take "appropriate corrective action reasonably likely to prevent the harassment from recurring." *Williams*, 361 F.3d at 1029.  The Seventh Circuit's decision in *Vance* suggests that IDOC failed to do so.

The *Vance* court concluded the employer "satisfied its obligation under Title VII by promptly investigating each of [the plaintiff's] complaints and taking disciplinary action when appropriate." *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011), *aff'd on other grounds*, 570 U.S. 421 (2013).  There, in response to a complaint that a racial epithet was used, the employer "promptly investigated, involved the appropriate supervisory personnel, and issued a written reprimand"; two supervisors

met with the harasser to discuss the matter separately; and a supervisor remained in contact with the plaintiff and assured her they were investigating. *Id.* A second complaint could not be corroborated, and investigation of a third complaint revealed competing versions of events. The court noted:

> It may be commonplace that an employee accused of verbally abusing or intimidating a coworker denies the allegation. But [the employer] did what it could and did not stop by accepting a simple denial. Moreover, the record does not reflect a situation in which all ties went to the discriminator; if it did, we would be inclined to send this case to a jury. [The employer], however, calibrated its responses depending on the situation. Sometimes when it was unsure who was at fault it counseled both employees; sometimes it warned alleged wrongdoers to take care or desist.

*Id.* at 472. When faced with competing complaints, the first of which was filed against the plaintiff, the employer counseled both employees. *Id.* And when the plaintiff made another complaint, and the alleged harasser denied it, the employer still formally warned the harasser to refrain from such actions. *Id.* at 472–73.

In contrast here, it seems that IDOC did "accept[] a simple denial." When Wright denied the alleged misconduct, Goss took his word for it and did nothing further. There is no indication that Goss even reminded him of appropriate workplace standards, let alone warned him to "take care or desist." A reasonable jury could conclude that simply asking the alleged harasser if he engaged in prohibited conduct, accepting his response at face value, then closing the case is not "appropriate corrective action reasonably likely to prevent the harassment from recurring."

Further, it was Goss's practice to find a complaint unfounded unless a third party witnessed the incident or the alleged harasser had previous complaints filed against him. That might indicate a procedure where "all ties went to the discriminator."

In sum, failure to investigate two incidents of nonconsensual physical contact, the acceptance of Wright's "simple denial" on the incident that was investigated, and IDOC's practice of finding complaints unfounded raise a genuine issue as to whether the State was negligent in remedying the harassment perpetrated by McCracken's coworkers. The State is not entitled to summary judgment on the sexual harassment claim.

## B. *Sex Discrimination*

McCracken also asserts that she was discriminated against because of her sex. A plaintiff establishes a prima facie case of discrimination under Title VII by establishing that (1) she is a member of a protected class, (2) she was meeting the employer's legitimate employment expectations, (3) she suffered an adverse employment action, and (4) she was treated less favorably than a similarly situated employee outside of her protected class. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508,* 846 F.3d 216, 225 (7th Cir. 2017). It is undisputed that McCracken was a member of a protected class based on her sex. Whether she suffered an adverse employment action and whether she was meeting IDOC's legitimate employment expectations at the time of the action are closer questions.

The Court agrees with the State that it is difficult to discern exactly what adverse employment actions McCracken believes she experienced. McCracken notes that the

State does not dispute that "the transfer of Plaintiff because she complained about sexual harassment, the denial of leave, the constructive discharge, the denial of training, and the termination," would comprise adverse actions, (Pl.'s Resp. in Opp'n 32, ECF No. 117), so the Court will assume those events form the basis of McCracken's sex discrimination claim.

    1.  <u>Transfer</u>

It is unclear when McCracken was ever transferred "because she complained about sexual harassment." The Court has only been able to find one instance in which McCracken was transferred: when *she* requested to move to a new dorm after she had initially confided in offender Erik Boaz in June 2019. (McCracken Dep. 138, ECF No. 116-2.) The Court struggles to see how accommodating McCracken's transfer request constitutes an adverse employment action. Moreover, without more, the mere transfer of McCracken from one unit to another does not rise to the level of an adverse action. *See Griffin v. Potter*, 356 F.3d 824, 829–30 (7th Cir. 2004) (transfer to different facility, resulting in increased commute time but no material change in duties or benefits, was not an adverse employment action); *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) ("A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment."). Any sex discrimination claim premised on McCracken's transfer therefore fails.

## 2. Denial of Leave

So, too, does any claim based on the "denial of leave" fail.  The Court assumes this refers to when McCracken's requests for time off for her wedding and daughter's pageant were not approved, but similar requests of her then-fiancé were green-lighted. (McCracken Dep. 75–78, ECF No. 116-2.)  A one-off denial of requested leave is a "mere inconvenience," not an adverse employment action. *Allen v. Potter*, 115 F. App'x 854, 861 (7th Cir. 2004) (seven instances where plaintiff was denied leave for precise dates she requested, but was not denied the ability to use leave time more generally, did not constitute adverse employment action).

## 3. Constructive Discharge

"Constructive discharge, like actual discharge, is a materially adverse employment action." *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). To show she was constructively discharged, McCracken must show that she "was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *Id.*  The Court noted that whether McCracken cleared the threshold for a hostile environment claim was a close call.  But when a plaintiff alleges that she resigned because of discriminatory harassment—as the Court assumes is the case here—she must demonstrate a discriminatory work environment that is "even more egregious than the high standard for hostile work environment." *Id.* (citing *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000), *cert. denied*, 531 U.S. 1078 (2001)).  McCracken has not made such a showing. In cases finding constructive discharge, the plaintiffs suffered much more severe and

sustained harassment. *See, e.g.*, *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (supervisor constantly made racist comments to plaintiff and held a gun to plaintiff's head); *Pa. State Police v. Suders*, 542 U.S. 129, 135–36 (2004) (supervisors subjected plaintiff to "continuous barrage" of sexual harassment, one supervisor pounded on furniture to intimidate plaintiff, and supervisors devised and executed plan to have plaintiff arrested for theft). The treatment McCracken experienced, while lamentable and even deplorable, did not rise to the level a reasonable person would find "unbearable."

### 4. Denial of Training

McCracken next asserts that she suffered an adverse employment action due to "denial of training." But "denial" is a misnomer—the training was merely delayed. Captain Wheeler told McCracken that she would not receive training until she stopped receiving discipline, which McCracken understood to mean she needed to be present for roll call. (McCracken Dep. 78–82, ECF No. 116-2.) After McCracken was present for roll call, she was scheduled for, and completed, the training. (*Id.* at 97, 105–06.) Any potential issue was therefore remedied. *See Chaib v. Indiana*, 744 F.3d 974, 983 (7th Cir. 2014), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). And without "any evidence that any delay . . . [in] the receipt of training caused any change in the terms or conditions of her employment," McCracken did not suffer an adverse employment action. *Id.* Further, as discussed in the evaluation of the sexual harassment claim, there is no evidence that the training was delayed because of McCracken's sex—she admitted Captain Wheeler

lacked impermissible motives and delayed the training solely because of her roll call issues. (McCracken Dep. 82, ECF No. 116-2.)  Therefore, McCracken cannot establish a discrimination claim based on the delay in training.

    5.  Termination

Termination may be the quintessential adverse action.  McCracken's claim, therefore, turns on whether she was meeting IDOC's legitimate employment expectations.

As evidence that she was, McCracken cites her performance ratings and receipt of a bonus award.  (Pl.'s Resp. in Opp'n 33, ECF No. 117.)  But the critical inquiry is whether McCracken was meeting IDOC's expectations "*at the time* of" her termination. *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 901 (7th Cir. 2005).  Simply, she was not.  IDOC expected its employees to refrain from engaging in relationships with offenders.  It had a policy to that effect.  McCracken knew this, which is why she covered her tracks by using a false name and contact information when she communicated with offender Erik Boaz.  She violated IDOC's policy prohibiting interaction with offenders outside of work and admitted to doing so.  Therefore, she was not meeting IDOC's expectations.

Even if she were, her claim would still fail because she cannot show that IDOC's "legitimate, nondiscriminatory reason" for her termination was pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  McCracken theorizes that Pinkston watched her on surveillance video, saw her converse with Boaz the day he comforted her during a panic attack, then intentionally moved Boaz to

McCracken's dorm to "set her up and cause[] the inappropriate relationship." (Pl.'s Resp. in Opp'n 32, ECF No. 117.) Even if the Court adopts this theory, it does not excuse McCracken's actions. "Her claims of sexual animus do not obscure the objective fact" that she was in an impermissible relationship. *See Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 760 (7th Cir. 1998). Any argument that the State is liable because "[t]he relationship wouldn't have happened" if "it weren't for the sexual harassment and retaliation," (McCracken Dep. 151–52, ECF No. 116-2), or if Pinkston hadn't "set her up," is simply untenable. The decision to enter into the relationship was McCracken's and McCracken's alone. She cannot hold the State liable for terminating her because of her own prohibited behavior.

IDOC provided a second reason for terminating McCracken: she admitted to impermissibly trafficking suboxone, although she now maintains that confession was false. However, since McCracken's inappropriate contact with an offender was a legitimate and nondiscriminatory reason for her termination, which McCracken cannot dispute, the Court need not address the trafficking issue.

In conclusion, because McCracken cannot show she suffered an adverse action and was meeting IDOC's legitimate employment expectations, the State is entitled to summary judgment on the sex discrimination claim.

## C. *Retaliation*

Lastly, McCracken claims she was retaliated against for reporting the harassment she experienced.

To establish a claim for retaliation under the direct method of proof, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) the protected activity and the adverse action are causally connected. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). A plaintiff can also proceed under an indirect method of proof, where she must show that 1) she engaged in protected activity, 2) she suffered a materially adverse action, 3) she was meeting the employer's legitimate expectations, and 4) she was treated less favorably than similarly situated employees who did not engage in protected activity. *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016). The Seventh Circuit has recently "questioned the value of the formal distinction" between the two methods and reiterated that under either method, "the core question is the same: 'could a reasonable trier of fact infer retaliation?'" *Id.* (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015)).

As to the first element, McCracken engaged in statutorily protected activity each time she filed an incident report or otherwise reported the sexual harassment she experienced. Therefore, survival of her retaliation claim turns on whether she experienced a materially adverse action and whether a reasonable trier of fact could infer the action was taken in retaliation. A materially adverse action is one "which might well have dissuaded a reasonable worker from engaging in protected activity such as making or supporting a charge of discrimination." *Robinson*, 894 F.3d at 830 (citing *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006)).

As with the sex discrimination claim, McCracken's retaliation claim is difficult to discern. While not clearly presented, she appears to argue that *all* the retaliation she experienced was an adverse action: Pinkston's conduct, Harris's slamming the gate, the denial of training, the denial of relief to use the restroom, the denial of time off, and so on.

Individually, it does not appear that these incidents would cross the "materially adverse" threshold.  However, a retaliation claim does not have to center on a single incident.  A plaintiff can assert that the collective harassment she experienced in retaliation amounted to an impermissible retaliatory action—often referred to as "retaliatory harassment."  *Poullard v. McDonald*, 829 F.3d 844, 857–58 (7th Cir. 2016); *Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 893 F.3d 372, 375 (7th Cir. 2018).  That appears to be what McCracken argues.

To assess this claim, the Court will first determine which incidents of harassment were causally connected to McCracken's reporting—i.e., which were taken as an act of retaliation.  It will then evaluate whether all the harassment, collectively, rises to the level of a materially adverse action.

1. <u>Causal Connection</u>

McCracken points to a host of actions that were taken in response to her reporting.  First, she identifies other officers' refusal to relieve her so she could use the restroom.  McCracken testified that it "got around" that she had complained of sexual harassment and that other officers' demeanor toward her "completely changed" after she complained.  (McCracken Dep. 189, ECF No. 116-2.)   She stated that she had

never been denied relief before she complained; afterward, it would happen every shift, despite contacting up to nine officers during times that were not busy.  (*Id.* at 186–92.)  Meanwhile, officers in other units were able to get relief.  (*Id.* at 185.)

The Court agrees with the State that McCracken's theory that Pinkston secretly orchestrated the denial is too much of a mere "hunch" for the Court to adopt. However, McCracken need not tie the conduct back to Pinkston.  She has sufficiently shown that the officers themselves had a retaliatory mindset based on the changed behavior, suspicious timing, similarly situated officers who were treated differently, and improbability that the denial could happen this frequently just by chance, despite never happening before.  A jury may find it was mere coincidence; but at this stage, the Court must draw all reasonable inferences in McCracken's favor, and it is reasonable to infer that this conduct occurred out of retaliation.

Second, McCracken cites the denial of training.  However, there is no evidence that McCracken's reporting was causally connected to the delay in receiving training. McCracken herself testified that Captain Wheeler did not have any improper motives for delaying the training.  (McCracken Dep. 82, ECF No. 116-2.)  Rather, she said he honestly believed McCracken had roll call issues, which she did, and that those issues prevented her from receiving training under IDOC policy.  Without demonstrating that her reporting caused the delay in training, McCracken cannot use the delay in support of her retaliation claim.

Third, McCracken identifies Harris's conduct after she reported his assault.  The incident where Harris would not open the gate for McCracken, then slammed it open

and shut as she walked by, occurred shortly after Harris received "a stern talking to" from Goss. (McCracken Dep. 49–53, ECF No. 116-2.) That same day, Harris asked McCracken if they could talk, then accused her of lying to him and leading him on. The following day, Harris did not pick up items from McCracken that he was supposed to as part of his work duties. These incidents were close enough in time to the reprimand from Goss to be considered retaliatory.

Fourth, McCracken points to the relieving officer's release—right after she complained about Harris's assault—of her personal information and comments to offenders about her sexual history. But as discussed previously, these statements are inadmissible hearsay and cannot be considered for purposes of summary judgment.

Fifth, McCracken cites the denial of her requests for time off. Shortly after she reported Coons's comment, she learned that her requests for time off had not been approved. She and her then-fiancé, Officer Coty Coffman, had both submitted requests for time off for their wedding and other events. Despite turning the requests in together, Coffman's was approved while McCracken's was "lost." (McCracken Dep. 75–78, ECF No. 116-2.) Here, McCracken has identified a situation in which she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity, and the State has offered no explanation for the differential treatment. Thus, this incident is properly considered as part of McCracken's retaliatory harassment claim.

Sixth, McCracken points to all of Pinkston's conduct. When she first reported the Harris assault, Pinkston said he could send the report directly to human resources so

it didn't get around that McCracken was "the kind of person to make reports like this all the time." As she was reporting another incident, Pinkston said, in front of other officers, that McCracken was not allowed to be left alone with another male officer since they already had one sexual harassment report filed by her and they "did not need another one of those." Later, Pinkston told her he would never train her or another female in segregated housing, and if she complained to human resources, he would tell them she was upset he wouldn't let her give him a blow job. After McCracken complained about that comment, Pinkston told her that she should not have complained. Later still, during the firearms review board meeting, Pinkston interrupted her and told her if she wasn't going to take the evaluation seriously, they would stop because there was no point in continuing. McCracken failed; she passed when she attempted it again, one month later, to a board without Pinkston. Pinkston also removed her from the list of training attendees (although she ended up receiving the training) and the same day she questioned Captain Wheeler about why she was removed, Pinkston showed up to her workspace and stared at her for thirty to forty-five minutes. Lastly, Pinkston pulled McCracken's hair.

In addition to the suspicious timing and Pinkston's own comments to McCracken, there is more evidence that supports Pinkston's retaliatory mindset. For example, an officer mentioned that he felt Pinkston was "picking on" McCracken because Pinkston had told him McCracken already filed one sexual harassment complaint. (ECF No. 116-9.)

A reasonable jury could conclude that Pinkston was effectively "out to get" McCracken because she was complaining about the harassment she experienced. Pinkston's initial comment suggests that the "kind of person" who complains to human resources was not a kind he appreciated. That was reinforced by his subsequent comments that they "did not need another" complaint and that McCracken "should not have complained" about his behavior, and by his informing other officers that McCracken had filed reports. He even threatened to make a false sexual harassment allegation against McCracken if she reported him for discrimination. A jury could conclude that Pinkston's ire about McCracken's complaints played a role in all of his actions. Therefore, all of his conduct could be considered as part of McCracken's retaliatory harassment claim.

Finally, the remaining incidents were properly considered sexual harassment but do not have any causal connection to McCracken's reporting: Robertson's "ass against the wall" comment; the initial Harris assault; Wright's intercourse comment, thigh caress, and buttocks grab; Coons's "the offenders will be happy to see you" comment; and the warden's comment that the harassers' word was better than McCracken's. The phone calls McCracken received from other officers about her relationship were not considered as part of the harassment claim because McCracken agreed they were not based on her sex. Similarly, they lack any connection to McCracken's protected activity and should not be considered as part of her retaliation claim.

The question, then, is whether the identified incidents collectively amounted to impermissible retaliation.

2.  <u>Applicable Standard</u>

The Seventh Circuit seemingly has used different standards in evaluating retaliatory harassment claims.  In *Boss v. Castro*, it noted there was a "paucity of caselaw" on the matter and ultimately decided there was "no reason retaliation-based actions by an employer must somehow be less objectively offensive than in the context of sex or race." *Boss v. Castro*, 816 F.3d 910, 920–21 (7th Cir. 2016).  Therefore, to succeed on a retaliatory harassment claim, a plaintiff would have to meet the same standard as in a racial or sexual harassment claim: the harassment was severe or pervasive.  *Id.*  In reaching this conclusion, the court cited *Burlington Northern*, the Supreme Court case establishing the "materially adverse" standard for retaliation claims, and an Eleventh Circuit case addressing the same issue.

A few months later, the Seventh Circuit decided *Poullard v. McDonald*.  The court made no mention of the *Boss* decision and simply applied the Supreme Court's standard from *Burlington Northern*, concluding the proper inquiry was whether the harassing conduct was severe enough to dissuade a reasonable employee from exercising her Title VII rights.  *Poullard v. McDonald*, 829 F.3d 844, 857–58 (7th Cir. 2016).

Most recently came *Flanagan*.  There, the court cited the *Boss* standard without further discussion, requiring the plaintiff to satisfy the severe or pervasive standard. *Flanagan v. Off. of Chief Judge of Cir. Ct. of Cook Cnty.*, 893 F.3d 372, 375 (7th Cir. 2018).

This Court finds the *Poullard* decision most faithful to Supreme Court precedent. When the *Burlington Northern* Court established the "materially adverse" standard for retaliation claims, it recognized that "Title VII's substantive provision and its antiretaliation provision are not coterminous"—the antiretaliation provision sweeps broadly to classify more conduct as impermissible. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 67 (2006). It has to, if the substantive provision is to succeed. "Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Id.* In short, if employees don't feel free to complain about their employer's discriminatory conduct, and to support their coworkers who do so too, Title VII can't function. In that sense, this Court respectfully follows *Poullard* and its fidelity to *Burlington Northern*, rather than the *Boss* court's assertion that there is "no reason retaliation-based actions by an employer must somehow be less objectively offensive than in the context of sex or race." Indeed, *Burlington Northern* laid out the reasons retaliation-based actions need not be as offensive.[4]

The Eleventh Circuit reached this same conclusion, overruling its previous decision, cited by the *Boss* court, because it had "ignored" *Burlington Northern*'s

---

[4] In the absence of *Poullard*, the Court would have been compelled to apply the *Boss* standard, which McCracken cannot meet. The Court noted that whether McCracken could satisfy the severe or pervasive standard for her sexual harassment claim was a close case. But while Harris's assault and Wright's physical touching were harassment, they were not retaliation—these incidents lack any causal connection to McCracken's reporting. Without those incidents, McCracken would not be able to nudge her retaliatory harassment claim across the severe or pervasive threshold.

binding precedent. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205–08 (11th Cir. 2021), *vacating Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).

In sum, *Burlington Northern* established the standard for retaliation claims. Retaliatory harassment, while not specifically addressed in the *Burlington Northern* decision, is simply one form of retaliation. Therefore, *Burlington Northern*'s "materially adverse" standard applies to McCracken's retaliatory harassment claim.

### 3. Applied to McCracken

Now that the Court has determined the applicable standard, it must apply it to McCracken's claim. The question is whether a reasonable jury, considering the retaliatory harassment McCracken experienced—denial of restroom relief, Harris's slamming the gate and not picking up his trays, denial of requested time off, and Pinkston's conduct—could find the harassment severe enough to dissuade a reasonable employee from exercising her Title VII rights. *Poullard*, 829 F.3d at 857–58. The Court concludes a reasonable jury could find that standard was met.

To be sure, reporting cannot "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, 548 U.S. at 68. And if McCracken's coworkers had simply iced her out, that would be one thing. But they did more than that. According to McCracken, not only did they ice her out, but they engaged in conduct that made every one of her shifts miserable. She testified that it was "humiliating" to bleed through her clothing during her menstrual cycle because she could not get to a restroom. Being unable to use the restroom for ten or twelve hours because your

coworkers refuse to relieve you cannot be considered a "minor annoyance" that "all employees experience."

Perhaps even more troubling is that McCracken's supervisor made things worse. Not only did Pinkston ignore McCracken's complaints, like when he laughed off her warning that Harris's harassment was continuing, but he added to them. A reasonable employee might stop filing complaints if she knew her supervisor would blab to other employees that she had complained, warn her male counterparts that they could not be alone with her, and stare at her from across the room for the better part of an hour. A reasonable employee might stay quiet if she knew her supervisor would remove her from a training opportunity that would advance her career, or disrupt the evaluation she needed to pass in order to receive the training. *Cf. Bell v. Env't Prot. Agency*, 232 F.3d 546, 555 (7th Cir. 2000) (supervisor's failure to greet or speak to the plaintiff and cancellation of one meeting was "trivial matter," not actionable retaliation). When considering all the retaliation McCracken experienced, a reasonable jury could find it reached a level that would dissuade a reasonable employee from making or supporting a charge of discrimination.

4. Employer Liability

As with McCracken's sexual harassment claim, however, IDOC is not automatically liable for the retaliatory harassment. There still must be a basis for imputing liability.

Assuming the liability structure for retaliatory harassment follows the same framework as liability for harassment in the first instance,[5] there is a genuine dispute as to IDOC's liability for at least some of the retaliatory harassment McCracken experienced.  As discussed more thoroughly with regards to McCracken's sexual harassment claim, a reasonable jury could find that IDOC cannot satisfy the two-part affirmative defense to avoid liability for Pinkston's retaliatory harassment.  The second element requires IDOC to show that McCracken unreasonably failed to take advantage of any preventive or corrective opportunities that were provided, but McCracken reported nearly all of Pinkston's conduct—in fact, her reporting often led to *more* action on Pinkston's part.  And in terms of the coworker retaliatory harassment, there is similarly a dispute as to whether IDOC was negligent in discovering or remedying the harassment.  When McCracken told Pinkston about Harris's refusal to open and slamming of the gate, Pinkston laughed it off. McCracken reported the restroom denial as early as November 2018 but was still experiencing the problem in June 2019.  At some point, Goss spoke with the warden, deputy warden, and major about the issue, and they communicated a procedure for officers to follow in that situation, but it is unclear when that conversation happened. (Goss Dep. 86, ECF No. 116-4.)  On those facts, the Court cannot conclude that IDOC

---

[5] The cases discussed in determining the standard for evaluating the harassment—*Boss, Poullard,* and *Flanagan*—did not address liability.  *Knox* affirmed an employer's liability for coworker retaliatory harassment when the employer "acquiesced" in it, *Knox v. Indiana*, 93 F.3d 1327, 1335–36 (7th Cir. 1996), although *Knox* was decided before the Court established a large portion of the liability framework in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  Here, under the "acquiescence" standard or the negligence standard, the outcome is the same.

took "prompt and appropriate corrective action reasonably likely to prevent" the issue from recurring.

In sum, there is a genuine issue as to whether McCracken was subjected to sufficiently severe retaliatory harassment and whether the State can be liable for it. Therefore, the State is not entitled to summary judgment on the retaliation claim.

## IV.   Conclusion

The State's motion for summary judgment is **granted in part** and **denied in part**. The motion is granted as to McCracken's sex discrimination claim, which shall be **dismissed with prejudice**. The motion is denied as to the sexual harassment and retaliation claims. The parties are **directed** to contact the Magistrate Judge for purposes of scheduling a settlement conference prior to trial.

**SO ORDERED.**

Date: 9/29/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to all counsel of record via CM/ECF.

49